549 F.2d 670
 UNITED STATES of America, Plaintiff-Appellant,
v.
Cecil R. MAYS, Robert Jack Coltrane, Buddy Herman Mathis,
Defendants- Appellees.
UNITED STATES of America, Plaintiff-Appellant,
v.
Robert Jack COLTRANE, Cecil R. Mays, J. Robert West,
Defendants-Appellees.
 Nos. 75-3083, 75-3084.
 United States Court of Appeals,
Ninth Circuit.
 March 3, 1977.
 
 Stephen V. Wilson, Asst. U. S. Atty., Los Angeles, Cal., for the government.
 Stephen D. Miller, Beverly Hills, Cal., for Mays.
 Appeal from the United States District Court for the Central District of California.
 Before BARNES, ELY and WRIGHT, Circuit Judges.
 OPINION
 BARNES, Senior Circuit Judge:
 
 
 1
 This appeal is from the dismissal before trial of certain counts in two federal indictments. The trial court ruled that the dismissal was constitutionally required by reason of alleged prejudice to the defendants due to pre-indictment delay of four and one half years between the completion of the acts charged and the return of the indictments by a Federal Grand Jury. The government pursuant to 18 U.S.C. § 3731 appeals the dismissals by the district court of the two indictments, Nos. 74-677 and 74-676.
 
 
 2
 I. FACTS.
 
 
 3
 A. SUMMARY OF THE CHARGES.
 
 
 4
 1. Indictment No. 74-677 includes thirty-two counts consisting of conspiracy (18 U.S.C. § 371), misapplication of bank funds (18 U.S.C. § 656), false entry in a bank statement (18 U.S.C. § 1005), mail fraud (18 U.S.C. § 1341), fraud by wire (18 U.S.C. § 1343), interstate transportation of monies obtained by fraud (18 U.S.C. § 2314), and aiding and abetting (18 U.S.C. § 2). Count 1 alleges a conspiracy between West, who was the Chairman of the Board and majority stockholder of the Southland National Bank (herein "Southland Bank" or "Southland"), and Coltrane and Mays. The primary objectives of the conspiracy were the purchase from West of controlling stock interest in Southland Bank by Coltrane and Mays, using the bank's own money through a scheme of allegedly fraudulently obtained loans, and a subsequent improper use of Southland Bank funds for the benefit of American West Nursing Centers, Inc. (herein "Nursing Centers") a corporation formed by Mays and others on March 17, 1969. Coltrane and Mays agreed to buy, but did not have sufficient funds to effectuate the purchase of, West's stock. It is alleged that they therefore conspired with West in an arrangement whereby West would approve loans to nominees of Coltrane and Mays, the proceeds from which would then be used to buy West's stock. Pursuant to the scheme, Coltrane and Mays allegedly caused false loan applications to be filed, and West would obtain their approval and record them in Southland Bank's records. Once in control of Southland Bank, Coltrane and Mays allegedly operated the bank solely for the benefit of themselves and their businesses, and in violation of various banking rules (e. g., exceeding Southland Bank's legal lending limit; see 12 U.S.C. §§ 21 et seq. and 221 et seq.). Counts 2 through 4 delineate an alleged scheme whereby Coltrane and Mays obtained a $100,000 loan from the Security National Bank of Reno, Nevada, through alleged false representations made via letters delivered by the U.S. postal service and by wire, which caused the above sum to be transported in interstate commerce in violation of statutes against mail fraud (Count 2), fraud by wire (Count 3), and the interstate transportation of money obtained by false representations (Count 4). Counts 5 through 23 and 26 through 30 detail the alleged fraudulent loans made by the defendants to the nominees in violation of 18 U.S.C. § 656 and 18 U.S.C. § 1005, and 18 U.S.C. § 2 aiding and abetting. Counts 24 and 25 relate to Coltrane's alleged individual misapplication of approximately $10,000 in Southland Bank's funds, and his falsification of bank records pursuant thereto. Counts 31 and 32 relate to Mays' alleged individual misapplication of approximately $30,000, and his falsification of bank records.
 
 
 5
 2. Indictment No. 74-676 includes ten counts consisting of conspiracy, misapplication of bank funds and false entries in bank statements. Count 2 charges a conspiracy between Coltrane, Mays and Mathis, the latter being a banker who controlled the Deposit National Bank (herein "Alabama Bank") in Prichard, Alabama. After Coltrane and Mays obtained majority shares in Southland Bank, they used approximately $500,000 of bank funds to pay off certain debts of their related businesses, principally those of Nursing Centers and Southland Financial Services. To accomplish this, they allegedly caused loan papers to be prepared for six nominees. Said papers were fraudulent because the money was not intended for the individuals named or for the purposes stated therein. The loan papers were sent to the Alabama Bank. Rather than funding the loans to the named persons, Mathis simply drew up a $500,000 certificate of deposit payable to Southland Bank which was entered on its books as an asset. Likewise, Coltrane and Mays caused a similar certificate and loans to be made to the Alabama Bank for Mathis' benefit. Count 2 of the indictment charges Coltrane and Mays with the misapplication of bank funds. Counts 3 through 10 relate to the falsification of bank records and statements concomitant with the above scheme.
 
 
 6
 B. HISTORY OF PROSECUTION.
 
 
 7
 The overt and substantive charges in Indictment No. 74-677 are alleged to have occurred between March 17, 1969 and October 10, 1969. Those in Indictment No. 74-676 are alleged as occurring between October 6, 1969 and November 17, 1969.
 
 
 8
 A regularly scheduled examination of Southland Bank by the National Bank Examiners (herein "Examiners") was completed in August 12, 1969 and a report was issued to the United States Comptroller of Currency (herein "Comptroller") and received by him on September 2, 1969. Certain statements which were ultimately used to frame the charges in Indictment No. 74-677 were contained in that report. A second examination by the Examiners was completed on January 16, 1970 and a report which covered charges contained in both indictments was received by the Comptroller on February 2, 1970. An examination of the Alabama Bank by the Examiners was made in November, 1969.
 
 
 9
 On November 19 and 20, 1969 the Examiners advised the Federal Bureau of Investigation ("FBI") of certain irregularities and possible fraudulent action in the operations of Southland. On December 10, 1969, the Examiners notified the United States Attorney for the Central District of California (herein "U. S. Attorney") of some of those improprieties. On January 23, 1970, Assistant U. S. Attorney Tomlinson notified the FBI that prior to the rendition of any "prosecutive" opinion by his office, he desired to receive a copy of the Examiners' report and a preliminary FBI report. On April 9, 1970, Tomlinson stated that he would decline to prosecute the case as there did not appear to be sufficient facts to indicate a successful prosecution of the case. On June 12, 1970, the Department of Justice requested a further explanation from the U. S. Attorney's Office on its refusal to prosecute.
 
 
 10
 Between July, 1970 and March, 1973, apart from three meetings on the matter, the U. S. Attorney's Office did not actively pursue the prosecution of the cases. During that same period, the FBI's involvement was limited to a series of interviews with prospective witnesses which lasted a period of about two months. Between January 23, 1970 and July 10, 1972, no time was spent on this investigation by the Comptroller's Office. Thereafter, 25 hours were spent in 1972 and 473 hours in 1973.
 
 
 11
 On or about March, 1973, the U. S. Attorney's Office took a more active role in the prosecution of the case. By December 19, 1973, witnesses and evidence were presented to a Federal Grand Jury. The indictments were returned on May 6, 1974.
 
 
 12
 The defendants were arraigned in both cases on June 3, 1974. On June 6, 1974, the cases were consolidated. On October 11, 1974, the district court judge granted the defendants' motion for discovery and ordered the government to turn over its records as to the prosecution of the cases. Subsequently, the defendants moved to dismiss for pre-indictment delay. On July 30, 1975, the district court issued an order dismissing certain of the counts because of pre-indictment delay.
 
 
 13
 C. PREJUDICE CLAIMED BY THE DEFENDANTS-APPELLEES.
 
 
 14
 The defendants asserted that their defense had suffered actual prejudice due to the pre-indictment delay caused by the government. They cited two forms of such prejudice, the deaths of three material witnesses and the dimming of memories of many of the live witnesses.[1]
 
 
 15
 D. Herrick and F. Fleming died in the same plane crash in January, 1974. Norman Stanley died in January, 1975. Herrick was Secretary-treasurer of the Nursing Centers and a member of its Board of Directors. He was in charge of the syndications of real estate for Nursing Centers. One of his duties was the preparation of financial statements, loan applications and other documentation necessary for loans from Southland. It was stated that Herrick was the one who assisted investors in Nursing Centers to obtain their loans from Southland. Herrick's involvement in the above capacities is fairly well documented in the record.[2] There was some evidence of the involvement of Coltrane and Mays in this stage of the loan process.[3]
 
 
 16
 Both Fleming and Stanley were Herrick's assistants in those financial aspects. They helped in the preparation of the forms and were also involved in obtaining signatures on the documents.
 
 
 17
 The defendants also asserted that the memories of many key witnesses had lapsed as to certain material facts and events due to the extended passage of time. Such claim of dimming of memories on the part of the witnesses is supported by the record, i. e., in the testimony of such witnesses to that effect before the Grand Jury and in the FBI interview reports.
 
 
 18
 D. DISPOSITION BY THE DISTRICT COURT.
 
 
 19
 The district court found the delay involved to be unreasonable, because it was "unusual and unnecessary." The judgment noted the fact that the government had not adequately explained or justified its gaps in the investigation and prosecution of the cases. He concluded that the delay was due solely to the government's "negligent and intentional conduct for its own convenience," and that had the government been diligent, the prejudice experienced by the defendants would have been avoided.
 
 
 20
 The deaths of Herrick, Fleming and Stanley were held to constitute actual prejudice as the evidence demonstrated that the decedents had been directly responsible for and involved in the preparation of the financial statements, loan applications and other documents which were the subject of the various counts in both indictments. The dimming of the memories of the live witnesses on material aspects of the indictments was also noted as contributing to the substantial prejudice caused by the delay.
 
 
 21
 The judge, upon motion of the defendants, dismissed Counts 1 and 5 through 10 of Indictment No. 74-676 (leaving four standing) and Counts 1, 5 through 23 and 26 through 30 of Indictment No. 74-677 (leaving seven standing) on the grounds that the loss of testimony of the decedent witnesses constituted substantial prejudice to the defendants' right to a fair trial in violation of the Due Process Clause of the Fifth Amendment.
 
 
 22
 Counts 2 through 4 of Indictment No. 74-677 were not dismissed as they involved only the Security National Bank of Reno transaction in which the decedent witnesses were not shown to have been participants. Counts 24, 25, 31 and 32 were not dismissed as they related to transactions in which defendants Coltrane and Mays were the principal parties. Count 3 of Indictment No. 74-676 was dismissed as defective. Counts 2, 4, and 9 of said indictment were not dismissed as they concerned certain inter-office activities of Southland Bank and the decedent witnesses were neither officers nor employees of Southland.
 
 
 23
 As an additional ground for the dismissal of the counts, the judge stated that he was exercising the "duty of the Court to prevent unfairness" due to the "usual and unnecessary" delay caused by the government.
 
 
 24
 II. ISSUES.
 
 
 25
 1. Did the district court apply the proper standard in determining whether the pre-indictment delay required dismissal pursuant to the Due Process Clause of the Fifth Amendment?
 
 
 26
 2. Was there sufficient evidence of actual prejudice to the defendants due to the deaths of the three witnesses and to the "dimming" of the memories of the remaining witnesses to warrant a decision to dismiss the various counts?
 
 
 27
 III. DISCUSSION.
 
 
 28
 The initial issue raised on appeal is the standard to be used in determining whether the Due Process Clause of the Fifth Amendment requires dismissal of an indictment before trial on the merits due to the pre-indictment delay caused by the government.[4] The Supreme Court has considered the question.
 
 
 29
 In United States v. Marion, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), the appellees had moved to dismiss because the criminal indictment was returned an "unreasonably oppressive and unjustifiable time" after the alleged offenses had been committed. Their contention was that the three year delay was due to the negligence and indifference of the United States Attorney in investigating and presenting the case to the Grand Jury. While they argued that the defense against the indictment would require the memory of many specific acts and conversations occurring several years before, no specific prejudice was claimed or demonstrated. The Court in its decision,[5] noted that while applicable statutes of limitation serve as the primary protection against the bringing of charges when the basic facts have been obscured by the passage of time, nevertheless, statutes of limitation do not fully define the defendant's rights with respect to the events that occur prior to an indictment. The government conceded and the Supreme Court agreed that:
 
 
 30
 ". . . the Due Process Clause of the Fifth Amendment would require dismissal of the indictment if it were shown at trial that the pre-indictment delay in this case caused substantial prejudice to appellees' rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused." Id. at 324, 92 S.Ct. at 465.
 
 
 31
 The Supreme Court went on to hold that the pre-indictment delay had not violated the Due Process Clause because "(n)o actual prejudice to the conduct of the defense is alleged or proved, and there is no showing that the Government intentionally delayed to gain some tactical advantage over appellees or to harass them." Id. at 325, 92 S.Ct. at 466.
 
 
 32
 Since the Marion decision, there has been a good deal of confusion as to whether the two elements delineated in the opinion actual (or substantial) prejudice, and intentional delay by the government for an improper purpose are to be applied in a conjunctive or disjunctive manner.[6] Indeed, as with the other circuits, this Circuit has not been entirely consistent in its articulation of the proper standard.[7]
 
 
 33
 The issue is a difficult one to decide as there are solid arguments for both interpretations. In support of the conjunctive interpretation, it is initially noted that the Court in Marion specifically used a conjunctive connector ("and") between its articulation of the two elements. Marion, supra, 404 U.S. at 324, 92 S.Ct. 455. Likewise in applying its standard to the facts of that case, the Supreme Court again uses the word "and," as opposed to a disjunctive connector such as "or" or "conversely."[8] Secondly, the language of the text strongly suggests that actual prejudice resulting from pre-indictment delay by itself is not enough to establish the need for dismissal.[9]
 
 
 34
 "Actual prejudice to the defense of a criminal case may result from the shortest and most necessary delay; and no one suggests that every delay-caused detriment to a defendant's case should abort a criminal prosecution." Id. at 324-25, 92 S.Ct. at 465.
 
 
 35
 Finally, as argued by the government, the dismissal by the trial court of an indictment is an extreme act if it occurs, as it has here, prior to any trial on the merits of the case. It is argued that such a result should only be used upon a demonstration of misconduct by the government. The two cases cited by the Court in Marion after its articulation of the test both involve prosecutorial misbehavior which lends credence to the government's interpretation here.[10]
 
 
 36
 For the disjunctive interpretation, it is initially noted that the test delineated by the Court in Marion was actually a summation of the concession made by the government in that case. As such, it may not represent the bottom line for dismissals based on pre-indictment delays. Secondly, what is involved here is not a question of the government's right to present its case but the constitutional rights of the individual defendant. Where the defendant is unable to properly defend himself, and consequently to establish his innocence, because the pre-indictment delay has deprived him of the witnesses and/or evidence necessary for his case, the defendant's right to Due Process of Law has definitely been jeopardized. Marion, supra, 404 U.S. at 324, 92 S.Ct. 455. Thirdly, to require the defendant to prove, in addition to actual prejudice, a specific bad intent on the part of the government places an extremely difficult burden on a defendant; one which he may not be able to meet without considerable time and expense on his part. Access to the evidence of such intent would be difficult to obtain as it would be largely in the government's possession. In addition, a tangential issue may arise as to whether some claim of privilege by the government would prevent the defendant from obtaining the necessary evidence.[11] Finally, the Court in Marion distinguished between the "real possibility of prejudice inherent in any extended delay" and actual prejudice. Marion, supra, 404 U.S. at 322-326, 92 S.Ct. at 466. The former was held to be adequately covered by the relevant statutes of limitation. The latter was to be protected by the Due Process Clause considerations. The protection afforded by the Due Process Clause has not, in general, been held to demand intentional misconduct on the part of the government before it is applied. The requirement of proof of such intentional action by the government in this situation is not warranted by the case law. Indeed, the Court in Marion stated that it was not making any absolute test in this regard and left it open to the courts to make their own judgments so long as they would be consistent with the reasoning in Marion.
 
 
 37
 "However, we need not, and could not now, determine when and in what circumstances actual prejudice resulting from pre-accusation delays requires the dismissal of the prosecution. . . . It would be unwise at this juncture to attempt to forecast our decision in such cases." Id. at 324-325, 92 S.Ct. at 465.
 
 
 38
 Rather than choose between the Scylla and Charybdis of disjunctive and conjunctive interpretations, it would seem that the key to the Marion opinion is stated in the following quote:
 
 
 39
 "To accommodate the sound administration of justice to the rights of the defendant to a fair trial will necessarily involve a delicate judgment based on the circumstances of each case." Id. at 325, 92 S.Ct. at 465.
 
 
 40
 We reject both the absolute position argued by the appellant (that there must be both actual prejudice and improper intentional delay) and that urged by appellees (that actual prejudice due to pre-indictment delay is enough). We prefer an approach which balances the factors in the individual situation.
 
 
 41
 Given that a balancing of the "circumstances" is to be made, a decision as to what those "circumstances" are and who will bear the burden of proof naturally arises. In this regard, Marion is mute. However, certainly the main elements suggest themselves.
 
 
 42
 First of all, there must be some demonstration of actual prejudice resulting from the delay. Such prejudice will inevitably be either the loss of witnesses and/or physical evidence or the impairment of their use, e. g., dimming of the witnesses' memory. The burden of presenting such prejudice is on the defendant. United States v. Griffin, 464 F.2d 1352, 1354-1355 (9th Cir. 1972), cert. denied, 409 U.S. 1009, 93 S.Ct. 447, 34 L.Ed.2d 302 (1973); United States v. Hauff, 395 F.2d 555, 557 (7th Cir.), cert. denied,393 U.S. 843, 89 S.Ct. 124, 21 L.Ed.2d 113 (1968). To establish actual prejudice sufficient to warrant a dismissal, the defendant must show not only the loss of the witness and/or evidence but also just demonstrate how that loss is prejudicial to him.[12] Marion, supra, 404 U.S. at 326, 92 S.Ct. 455; United States v. McGough, 510 F.2d 598, 604 (5th Cir. 1975). As stated in United States v. Galardi, 476 F.2d 1072, 1075 (9th Cir.), cert. denied, 414 U.S. 839, 94 S.Ct. 90, 38 L.Ed.2d 75 (1973), the latter proof must be definite and not speculative: "The assertion that a missing witness might have been useful does not show the 'actual prejudice' required by Marion."A second element to be considered is the length of the delay. This aspect, however, must be weighed in conjunction with the third element the reason for the delay. As noted in Hoffa v. United States, 385 U.S. 293, 310, 87 S.Ct. 408, 417, 17 L.Ed.2d 374 (1966):
 
 
 43
 "There is no constitutional right to be arrested. The police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect, risking a violation of the Fourth Amendment if they act too soon, and a violation of the Sixth Amendment if they act too soon, and a violation of the Sixth Amendment if they wait too long. Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall short of the amount necessary to support a criminal conviction." (Footnote omitted.)
 
 
 44
 The courts have traditionally granted the government a good deal of leeway in their decisions as to the timing of arrests and indictments. See United States v. Cowsen, 530 F.2d 734, 737 (7th Cir.), cert. denied, 426 U.S. 906, 96 S.Ct. 2227, 48 L.Ed.2d 831 (1976) ongoing investigation justified delay; 8B Moore's Federal Practice P 48.03(2) at p. 48-29 (2d ed. 1975). Nevertheless, intentional delays for improper purposes will not be sanctioned. In addition, although weighted less heavily than deliberate delays, negligent conduct can also be considered, since the ultimate responsibility for such circumstances must rest with the government rather than the defendant. United States v. Barket, 530 F.2d 189, 195 (8th Cir. 1976); cf. Barker v. Wingo, 407 U.S. 514, 531, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972); United States v. Simmons, 536 F.2d 827, 831 (9th Cir. 1976). Where the defendant has established actual prejudice due to an unusually lengthy government-caused pre-indictment delay, it then becomes incumbent upon the government to provide the court with its reason for the delay.
 
 
 45
 A final comment concerning the standard to be used has to do with where the fulcrum for the balancing is to be placed. In Marion, the Court states that the presence of actual prejudice resulting from pre-indictment delays would not by itself warrant the dismissal of a criminal prosecution. The greater the length of the delay and the more substantial the actual prejudice to the defendant becomes, the greater the reasonableness and the necessity for the delay will have to be to balance out the prejudice. However, despite the degree of actual prejudice, for a judgment in favor of dismissal, there must be some culpability on the government's part either in the form of intentional misconduct or negligence.
 
 
 46
 In considering the present case, the standard employed by the district court below was not clearly erroneous. It is apparent from the court's findings of fact and conclusions of law that the judge, at least as to the majority of his grounds for granting dismissal,[13] engaged in the type of "delicate judgment based on all of the circumstances" of the case as prescribed by Marion.[14] While we approve the apparent standard used by the district court, an examination must still be made as to the court's findings as to the length of the delay, its reasonableness, and the actual prejudice to the defendants.
 
 
 47
 The length of time between the commission of the last overt act alleged in the indictments (November 1969) and the return of the indictment (May 1974) was approximately four and one half years. There is evidence that the government knew of many of the irregularities and the possibility of criminal violations as early as January, 1970.
 
 
 48
 The district court's conclusion that the delay by the government in the present case was "unusual and unnecessary" is supported by the record. While the government argues that the delay was due to the complexities of the case and to the fact that the defendants were skillful in their concealment of the offenses, the government has not coupled those claims with any evidence that its agents were actually working on the cases during a great portion of the interim. The judge cited a period between September 9, 1970 and March 13, 1973 where, except for three meetings by government agents and a little over one month of interviews by the FBI, there was no government effort to prosecute these cases.
 
 
 49
 However, in addition to labelling the delay "unusual and unnecessary," the judge implies that the pre-indictment delay was intentional.[15] We find such conclusion is clearly erroneous as we find no evidence which would support it. The government's failure to prosecute in this case was clearly negligent, but only that.
 
 
 50
 As to the district court's finding of actual prejudice to the defendants, several problems arise. As stated above, to establish actual prejudice the defendants must show what evidence was lost due to the delay and also the way that evidence would have helped in their defense against the government charges. Basically, the trial judge cited two grounds for his holding that there was actual prejudice in the present case, (1) the loss of the testimony of the decedent witnesses, and (2) the dimming of the memories of the remaining witnesses.
 
 
 51
 It is adequately demonstrated in the record that Herrick, Fleming and Stanley were directly involved in the preparation of some, and perhaps all,[16] of the financial statements, loan applications and other documents filed with the Southland Bank by the nominees of Coltrane and Mays. However, those findings of fact only give a general description of the involvement of those individuals in this case. They do not provide any information as to the deceased parties' usefulness to defendants' case. While it is contended by the defendants that the decedent witnesses would have testified that the defendants did not participate in any way with the preparation of the papers and documents for the loan transactions between the individuals associated with Nursing Centers and Southland Bank, there is no evidence to support such contentions other than the affidavits of the defendants themselves, which are, of course, self-serving and based only on speculation.[17] Consequently, the first problem raised is the lack of any substantial, convincing evidence to indicate what the testimony of the missing witnesses would be.
 
 
 52
 Concomitant with the first problem is the question as to how the loss of the decedent witnesses is to be evaluated. Admittedly, the documentary evidence will assume a more important role in the disposition of the case, and if it is shown that the papers are fraudulent, such evidence will weigh more heavily against the defendants without some helpful explanation of their non-involvement with the drafting of the papers. However, because the record only reveals what the subject matter of the decedent witnesses' testimony would have been and not its actual content, its potential benefit or detriment to the defendants cannot be accurately evaluated. As it stands now, a trier of fact might as well assume that the decedents would have placed all of the blame on the defendants, as to assume that they would have exonerated them.[18] In either case, the conclusions appear to us as mere speculation, which cannot serve as the grounds for a finding of actual prejudice. Cf., United States v. Finkelstein, 526 F.2d 517, 526 (2d Cir. 1975), cert. denied, sub. nom. Scardino v. United States, 425 U.S. 960, 96 S.Ct. 1742, 48 L.Ed.2d 205 (1976). A recent decision of this Court supports our view on this issue. In United States v. Sand, 541 F.2d 1370, 1373 (9th Cir. 1976), it is stated:
 
 
 53
 "Thus, of the thirteen possible witnesses, the non-appearance of at most four is attributable to the delay. Even assuming that all four would have appeared, it is not clear that their testimony would more likely have been helpful than harmful to (the defendants). The burden of so showing was defendants'. The district court agreed with the government that these witnesses probably would have been concerned with the consequences of their own involvement in these enterprises and would not have incriminated themselves in order to exculpate defendants."
 
 
 54
 (In the Sand case five of the thirteen possible witnesses died.)
 
 
 55
 Insofar as the uniform lack of memory on the part of the live witnesses, the argument is raised by the government that a claim that the memories of witnesses have dimmed does not constitute actual prejudice. That contention is supported by Marion, supra, 404 U.S. at 325-326, 92 S.Ct. 455. See also United States v. Andros, 484 F.2d 531, 533 (9th Cir. 1973). However, there is a distinction to be made between a mere claim of dimmed memories and proof that the memories of witnesses have indeed been impaired by the passage of time. Where impairment is shown, it may be argued that such element is a factor to be considered as contributing to the actual prejudice to the defendant. Ross v. United States, 121 U.S.App.D.C. 233, 349 F.2d 210, 213-215 (1965). In the present case, the record is replete with examples of the witnesses' incapacity to remember aspects of key transactions. While many instances of such memory loss seem rather convenient, we prefer to rely on the trial judge's evaluation of the witnesses.
 
 
 56
 However, once again the problem arises as to determining what was the evidence lost and how the defendants are adversely prejudiced by that loss. In the record, we find no indication of how the live witnesses would have testified had their memories not dimmed. Therefore, it is impossible to evaluate their contribution to the defense against the charges.
 
 IV. CONCLUSION
 
 57
 As discussed above, this Court is in general agreement with the district court's treatment of the case except for the final element of the adequacy of the defendants' showing of actual prejudice. However, as that last element is the foundation upon which the defendants must base their Due Process claims, it is concluded that the district court erred in its dismissal of the various counts (with the exception of Count 3 of Indictment No. 74-676 which was defectively set forth).
 
 
 58
 We reverse and remand without prejudice to the trial court, with instructions that he may again consider the issues, perhaps (but not necessarily) at the time of trial, and/or prior to the submission of any counts to the jury.
 
 
 59
 SO ORDERED.
 
 ELY, Circuit Judge, dissenting:
 
 60
 I respectfully dissent.
 
 
 61
 The judgment of the majority, condemning as "clearly erroneous" the District Court's findings of actual prejudice attributable to four and one-half years of unjustifiable pre-indictment delay on the part of the prosecution is to me perplexing if, indeed, not wholly inexplicable. I cannot fairly envision, in the absence of intentional prosecutorial delay taken for purposes of securing tactical advantages, a more compelling case for the trial judge to conclude that the defendants cannot be afforded, as they must, their preeminent due process right to a fair trial.
 
 
 62
 I do, however, express my agreement, in the beginning, with the majority's preliminary holding that the District Court, in considering the pre-trial motion for dismissal, appropriately "engaged in the type of 'delicate judgment based on all of the circumstances' of the case as prescribed by Marion." Supra at 678. Pre-indictment delays, of course, have always generated particularly sensitive judicial problems requiring careful accommodations between the public's interest in effective law enforcement and the constitutionally protected interest of an accused in the fairness and reliability of the judicial process. See Woody v. United States, 125 U.S.App.D.C. 192, 370 F.2d 214, 218 (1966) (separate opinion of McGowan, J.). The appropriate contours of pre-indictment delay doctrine, further etched by the thorough opinion of the majority, have, however, only recently begun to emerge. In a superb discussion, I think, and in the face of conflicting precedents, my Brother Barnes interprets United States v. Marion, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), to require the defendant to prove "actual prejudice," but not to require further proof of intentional prosecutorial gamesmanship in crafting delay. I agree that the Due Process Clause does not, generally speaking, depend upon intentional governmental misconduct in order for its fair trial guarantees to become operative. Moreover, I do not dispute the majority's proposition that the law does not warrant an exception to this principle in the pre-indictment context. Ultimately, in light of the important countervailing interest in effective law enforcement, I think none could be fairly dissatisfied with the majority's holding that even when a defendant has demonstrated "actual prejudice" due to an inordinate pre-accusation delay, dismissal is nonetheless inappropriate if the Government can justify the delay.[1] I would emphasize, however, that insofar as we accommodate the Government in these matters, it must bear the proximate risks of harm sparked by any delay for which it, itself, is responsible.
 
 
 63
 As my Brothers readily affirm, there is absolutely no question in this case that the delay was inordinate and in fact attributable to the gross negligence of the Government. After an Assistant United States Attorney initially concluded that there was insufficient evidence to warrant prosecution, approximately three years were allowed to elapse before any further investigation or prosecution was significantly pursued. Indeed, in the whole catalogue of the American law, I daresay that there are few, if any, instances of culpable delays more egregious than the four and one-half years documented in this case. The intolerable length of the delay and the high degree of government culpability are, without doubt, appropriate factors for the trial judge to consider when assaying whether demonstrable prejudice justifies dismissal. Accordingly, as I view the facts here presented, the trial judge's "delicate judgment" to dismiss the selective counts of the indictments simply cannot be upset if the record reflects any demonstrated prejudice attributable to the delay. The majority contends, as of course it must, that the record is barren in this respect. If my Brothers are wrong as to this, then I think it not disrespectful to suggest that they have unintentionally abused the appellate function.
 
 
 64
 The supposed infertility of the record depends entirely upon the gloss that the majority places upon the words "actual prejudice"; and it is the majority's discussion of the "actual prejudice" requirement that constitutes the gravamen of my protest.
 
 
 65
 My Brothers strain to the uttermost limits in arguing that the death or dimmed memories of potential defense witnesses does not actually prejudice a defendant unless he can demonstrate the extent to which these witnesses would have testified, respectively, had they lived or had their memories remained unobscured. The obvious question, as the majority recognizes, is in what manner can a defendant show that particular witnesses, no longer available or laboring under stale memories, could enhance his defense if the government had proceeded through the indictment judiciously? See Ross v. United States, 121 U.S.App.D.C. 233, 349 F.2d 210, 215 (1965) ("In a very real sense, the extent to which he was prejudiced is evidenced by the difficulty he encountered in establishing with particularity the elements of that prejudice."); cf. United States v. Wahrer, 319 F.Supp. 585, 588 (D.Alaska 1970). The obvious answer, in the overwhelming number of cases is, I should think, that the burden of summoning affidavits from buried bodies or dimmed minds will be insurmountable.
 
 
 66
 The practical impossibility of meeting a burden, I concede, does not suggest necessarily that the burden is erroneously defined. But I am, nonetheless, wholly convinced that the majority's conception of actual prejudice is, in this case especially, mistaken.[2] The question for the trial judge should not be whether the record, viewed in light of the independently proved potential testimony of now deceased witnesses, indicates that the defendant is either guilty or innocent as charged. Rather, the inquiry should be whether that determination can be made, ultimately, in a forum wherein the judge has confidence that the pertinent transactions can be reconstructed accurately. To illustrate, in United States v. Wilson, 357 F.Supp. 619 (E.D.Pa.1973), appeal dismissed, 492 F.2d 1345 (3d Cir. 1973) reversed and appeal reinstated, 420 U.S. 332, 95 S.Ct. 1013, 43 L.Ed.2d 232 (1974), the defendant was charged with embezzling funds from a labor organization of which he was the business manager. The manner in which the funds allegedly were converted was by way of a check signed by two officers of the union. Both officers had since died, one during a period of unjustifiable pre-indictment delay. Although the Government presented evidence that the now deceased co-signers of the check were controlled by the defendant, the court refused to evaluate the contested veracity of the potential testimony of the deceased witness. The court concluded: "Although the government contends that this is only a showing of potential or speculative prejudice, there is an absolute certainty as a signer of all checks that . . . (the witness) would add testimony of utmost importance to the trial." Id. at 621. See also United States v. Haulman, 288 F.Supp. 775, 778-79 (E.D.Mich.1968).
 
 
 67
 The principle to be emphasized, as extrapolated from the Wilson example, is that whether or not missing or deceased witnesses (coupled or not coupled with dimmed memories of available witnesses) translates into "actual prejudice" to the defense depends on the materiality of their connection to the crucial events which must be reconstructed at trial. The critical inquiry should not be whether independent evidence demonstrates that the missing witness intended to exculpate the defendant and how, but rather whether the witness had a material basis upon which to provide significantly exculpatory information.[3]
 
 
 68
 Thus, in United States v. Lovasco, 532 F.2d 59 (8th Cir. 1976), cert. granted, 429 U.S. 844, 97 S.Ct. 233, 50 L.Ed.2d 164, 1976, a case presenting a due process claim far less compelling than the one we face here,[4] the defendant had been charged with three counts of unlawful possession of handguns stolen from the mails and a fourth count of engaging in the business of dealing in firearms without a license. The defendant testified that a named individual, then deceased, sold him some of the firearms in question, and that this individual, were he available, would testify that he (the defendant) did not know that the firearms had been stolen from the mails. No showing was made that the missing witness actually would have testified on behalf of the defendant. Nevertheless, the court affirmed the District Court's dismissal of the first three counts because the missing witness had a material connection to the subject transactions whereby the defendant acquired the guns. The court, however, reversed the dismissal of the fourth count because it related to a transaction in which the missing witness was not a participant. Id. at 61-62.
 
 
 69
 Similarly, in United States v. Barket, 530 F.2d 189 (8th Cir. 1976), the defendant was charged with making an unlawful political contribution and with the misapplication of bank funds. The court affirmed the indictment's dismissal because "(w)itnesses who might have been able to demonstrate that the transaction was in fact intended as a bona fide loan or to disprove the alleged political contribution aspect of the loan transaction are now dead or unable to recall circumstances that existed more than five years ago." Id. at 196. Compare United States v. Quinn, 540 F.2d 357 (8th Cir. 1976) (distinguishing Barket and Lovasco and reversing the dismissal of an indictment because the missing informant clearly had no basis for providing information material to the defense);[5] United States v. Hauff, 395 F.2d 555, 556 (7th Cir. 1968). See also United States v. Dukow, 453 F.2d 1328, 1330 (3d Cir. 1972) (deceased witnesses possessed no "special knowledge" of the transaction in question).
 
 
 70
 Agreeing with the basic fairness of the Eighth Circuit's view, I would evaluate the present appeal in terms of whether or not the trial court clearly erred in finding that the deceased witnesses were critical participants in the transactions upon which the dismissed counts were based. If these witnesses were critical participants, then, indubitably, they had a firm basis upon which to provide information material to the accurate reconstruction of the events leading to the belated indictments; thus, the unavailability of their testimony would unfairly impair the ability of the defendants to defend against the charges. And once more, I emphasize, as did, apparently, the District Court, the inexcusable responsibility of the prosecution for the prejudicial delay.
 
 
 71
 I respectfully submit, therefore, that this case fairly shrieks of "actual prejudice." The record demonstrates that Herrick and Fleming, who died while the prosecution dallied, and Stanley, who died eight months after the indictments were returned, were directly involved in the preparation of perhaps every critical document filed with the Southland National Bank ("SNB") by the nominees of Mays and Coltrane. Indeed, Herrick, who was Secretary-Treasurer and a director of American West Nursing Center, Inc. ("AWNC") and who was in charge of the syndication of its real estate, reportedly assisted investors in AWNC to obtain their loans from SNB and further suffered the primary responsibility for preparing each and every document necessary to perfect the transactions. Moreover, as even the majority is forced to point out, "the record is replete with examples of the witnesses' incapacity to remember aspects of key transactions.[6] Supra at 680 (emphasis supplied). Compare United States v. Naftalin, 534 F.2d 770, 773 (8th Cir. 1976) (memories of witnesses not crucial because of existence of recorded statements). Although dimmed memories may not constitute "actual prejudice" under the weight of precedent, United States v. Clardy, 540 F.2d 439, 441-42 (9th Cir. 1976), nonetheless, dimmed memories may indeed "tip the balance" in otherwise close cases, United States v. Quinn, supra, 540 F.2d at 362, which this one is not.
 
 
 72
 The District Court did not clearly err in determining that the defendants' claims of prejudice were not speculative. In fact, I would have thought that a holding to the contrary would have been clearly erroneous. There is an absolute certainty that the deceased witnesses and the witnesses whose memories have dimmed in material respects would have been able to contribute trial testimony of utmost importance had it not been for the four and one-half years of pre-indictment delay for which the defendants were in no way responsible.[7] The Government did not, and obviously could not, prove that the testimony, if available, would not have been of critical importance to the defense.[8] Compare United States v. Joyce, 499 F.2d 9, 20 (7th Cir. 1974) cert. denied, 419 U.S. 1031, 95 S.Ct. 512, 42 L.Ed.2d 306 (1974).
 
 
 73
 The evident prejudice suffered by the appellees leads me ineluctably to one final, troublesome point: The ultimate outcome of this case upon remand is, it seems to me, foreordained. Assuming, as I do, that the Government will prosecute on the counts reinstated by the majority, and that the evidence will add little to that revealed by the carefully conducted pre-trial inquiry, there can be little doubt but that the District Court must again dismiss the same counts on pre-indictment delay grounds at the close of trial. My Brothers concede that this must be done if the prejudice that I already see is shown during the trial. As a result, our Nation's taxpayers will have financed a useless six months trial in a court that is already heavily burdened. This will again give rise to ancient complaints of "the law's delay." And, unfortunately, it was the Government that here engendered this enormously expensive and troublesome process by failing to execute its prosecutorial duties with the diligence which our people have every conceivable right to expect, and with which the appellees, whether my Brothers like it or not, had a constitutional right to demand. It is anomalous, even curious, in the circumstances here, that the majority so painstakingly assaults the meticulous and logical findings[9] of the District Court, findings that are supported by substantial, irrefutable evidence. Of more concern to me, however, is this patent, although isolated, example of remarkable inefficiency in the legal process.[10]
 
 
 74
 I would AFFIRM.
 
 
 
 [1]
 A third form of actual prejudice was claimed in the motion of defendant Mays to dismiss the indictments, the loss of relevant documentation and other physical evidence. However, no examples of the specific missing documents or evidence were provided either in the motion, in the record or in the appellees' briefs. That claim is dismissed as without support
 
 
 [2]
 See e. g., Report by Examiner agent W. Freitas of an interview with Herrick prior to the latter's death, Clerk's Transcript ("CT") pp. 1089-1090; Affidavit of Robert Mallano, Herrick's attorney, submitted by government into evidence, CT pp. 845-846; Testimony of Robert Lawson, an officer of Nursing Centers, Reporter's Transcript ("RT") vol. II, pp. 37-42; Testimony of N. Busch, employee of Nursing Centers, RT vol. II, pp. 54-58
 
 
 [3]
 Seven of the twelve nominee-borrowers made no mention of Herrick in connection with their loans as reported in certain government interviews. Conversely, six of the borrowers do mention Mays in connection with said loans. Gov't Ex. 6a-c. Herrick, in the aforementioned interview with Freitas, stated that Coltrane instructed him as to the manner in which the asset and income figures for the perspective borrowers were to be filled out on the loan documents. Def. Ex. II. In the FBI report for one of the nominee-borrowers, Cavin, the witness states that he recalled that Mays appeared to be in control of the Nursing Centers and that Herrick was only doing the legwork and trying to learn the ropes. Gov't Ex. 6a
 
 
 [4]
 Initially, all the defendants moved to dismiss for pre-indictment delay citing three grounds: 1) Sixth Amendment right to speedy trial, 2) Rule 48(b) of the Federal Rules of Criminal Procedure ("FRCrP") which permits discretionary dismissal by the court "If there is unnecessary delay in presenting the charge to a grand jury or in filing an information against a defendant who has been held to answer to the district court, or if there is unnecessary delay in bringing a defendant to trial . . .," and 3) Fifth Amendment right to Due Process. However, in United States v. Marion, 404 U.S. 307, 319 & 321, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), the Supreme Court specifically held that both the Sixth Amendment right to a speedy trial and Rule 48(b) do not come into play until after the individual has been placed under arrest. This rule has been followed in this Circuit and others. United States v. Jackson, 504 F.2d 337, 339 (8th Cir. 1974), cert. denied, 420 U.S. 964, 95 S.Ct. 1356, 43 L.Ed.2d 442 (1975); United States v. Joyce, 499 F.2d 9, 19 (7th Cir. 1973), cert. denied, 419 U.S. 1031, 95 S.Ct. 512, 42 L.Ed.2d 306 (1974); United States v. Giacalone, 477 F.2d 1273, 1275-1276 (6th Cir. 1973); United States v. Carey, 475 F.2d 1019, 1020 (9th Cir. 1973); cf., Dillingham v. United States, 423 U.S. 64, 65, 96 S.Ct. 303, 46 L.Ed.2d 205 (1975)
 
 
 [5]
 The Court also decided the applicability of the Sixth Amendment guarantees to the pre-indictment period. Marion, supra, 404 U.S. at 313-323, 92 S.Ct. 455
 
 
 [6]
 Many references to the Marion test state that both elements are to be found in the facts of the case. See, e. g., United States v. Duke, 527 F.2d 386, 390 (5th Cir.), cert. denied, 426 U.S. 952, 96 S.Ct. 3177, 49 L.Ed.2d 1190 (1976); Joyce, supra, 499 F.2d at 19-20; United States v. Parish, 152 U.S.App.D.C. 72, 468 F.2d 1129, 1132 (1972), cert. denied, 410 U.S. 957, 93 S.Ct. 1430, 35 L.Ed.2d 690 (1973). Alternatively, some courts have stated that the presence of either element is sufficient. See, e. g., United States v. Pollack, 175 U.S.App.D.C. 227, 534 F.2d 964, 969 (1976); Giacalone, supra, at 1276-1277. Some courts have focused primarily on whether the delay on the part of the government was intentional and for an improper purpose. E. g., United States v. Zane, 489 F.2d 269, 270 (5th Cir. 1973), cert. denied, 416 U.S. 959, 94 S.Ct. 1975, 40 L.Ed.2d 310 (1974). Others have considered solely the question of substantial prejudice to the defendant. E. g., United States v. Dukow, 453 F.2d 1328, 1330 (3d Cir.), cert. denied, 406 U.S. 945, 92 S.Ct. 2042, 32 L.Ed.2d 331 (1972). The Eighth Circuit has established its own standard which considers 1) the unreasonableness of the delay and 2) the prejudice to the defendant's ability to defend against the charges. United States v. Lovasco, 532 F.2d 59, 61 (8th Cir. 1976), cert. granted, 429 U.S. 884, 97 S.Ct. 233, 50 L.Ed.2d 164 (1976). (But see dissents of J. Henley in both Lovasco, supra, and Barket, infra, stating that the Marion test requires both substantial prejudice and intentional delay on the part of the government.)
 It should be noted that the overwhelming majority of the cases did not find the requisite element of actual prejudice to the defendant caused by the delay. Hence, it might be argued that the discussions of the test are dicta. See United States v. Barket, 530 F.2d 189, 194-195 (8th Cir. 1976); accord, United States v. White, 470 F.2d 170, 175 (7th Cir. 1972).
 
 
 [7]
 Some Ninth Circuit cases have stated the two elements in the disjunctive. e. g., United States v. Sand, 541 F.2d 1370, 1373 (9 Cir. 1976); United States v. Manning, 509 F.2d 1230, 1234 (9th Cir. 1974), cert. denied, 423 U.S. 824, 96 S.Ct. 37, 46 L.Ed.2d 40 (1975); United States v. Erickson, 472 F.2d 505, 507 (9th Cir. 1973). Others have stated that both elements must be shown. United States v. Cordova, 537 F.2d 1073, 1076 (9th Cir. 1976); United States v. Andros, 484 F.2d 531, 533 (9th Cir. 1973); United States v. Griffin, 464 F.2d 1352, 1354 (9th Cir. 1972), cert. denied, 409 U.S. 1009, 93 S.Ct. 444, 34 L.Ed.2d 302 (1973). It is noted that in none of the above cases was the prejudice found to be "actual" or "substantial."
 
 
 [8]
 Marion, supra, 404 U.S. at 324-325, 92 S.Ct. 455
 
 
 [9]
 Some cases, in dicta, have held that pre-indictment delay for improper purposes on the part of the government would be sufficient by itself, even if no actual prejudice to the defendant were shown. See United States v. Emory, 468 F.2d 1017, 1019 (8th Cir. 1972). However, such contention seems contrary to the Marion decision and to Hoffa v. United States, 385 U.S. 293, 310, 87 S.Ct. 408, 417, 17 L.Ed.2d 374 (1966), wherein it is stated that "there is no constitutional right to be arrested."
 
 
 [10]
 Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)
 
 
 [11]
 In the present case, the government, pursuant to a court order, turned over its records regarding the prosecution of the cases to the defendants' attorneys. However, the government maintains, even though it did not object at the time, that the court's order was contrary to Rule 16 of the FRCrP
 
 
 [12]
 A problem for the defendant admittedly arises in the demonstration of how a now absent witness would have contributed to the defendant's defense had he been available to testify. While the witness may have been intimately involved in the activities which are the subject of the criminal charges facing the defendant, until the defendant is indicted or arrested, he has no reason to attempt to preserve the witness's testimony. Consequently, if the witness becomes unavailable prior to the indictment, the defendant may not have any real proof as to what testimony that witness could have presented, but may nevertheless feel that his defense has been impaired. Conversely, however, unless the defendant can make some showing as to what the testimony would have been, or specifically how the witness could have exonerated him, there is no way of knowing whether the defendant is merely speculating as to the contribution of the witness to his defense or perhaps even attempting to take advantage of the witness's unavailability to make a Due Process claim when it is in reality unfounded. In a criminal prosecution, the government bears the burden of proving guilt beyond a reasonable doubt. The loss of witnesses therefore has an impact on the government's case as well as on the defense. Cf., Marion, supra, 404 U.S. at 322, 92 S.Ct. 455. This is especially true where the deceased witnesses are allegedly involved in the unlawful activity themselves. Cf., Sand, supra, 541 F.2d at 1373
 
 
 [13]
 The trial court also mentions, as an alternative ground for dismissal, the exercise of the court's duty to prevent unfairness due to the unreasonable pre-indictment delay by the government. Such ground is in error insofar as it is based on Rule 48(b) of the FRCrP. See footnote 4, supra
 
 
 [14]
 See the district court's Conclusions of Law Nos. 11 through 14, CT pp. 1101-1103
 
 
 [15]
 See Finding of Fact No. 63, CT p. 1087 and Conclusion of Law No. 10(b), CT p. 1100
 
 
 [16]
 See footnote 3, supra
 
 
 [17]
 The lack of supporting evidence would perhaps not be considered as adversely to the defendants in a situation where they had no notice of the possibility of criminal indictments. However, in the present situation, Coltrane was interviewed by an Examiners' agent in November, 1969 and by an FBI agent on July 28, 1970 and January 24, 1972. In both of the latter interviews, Coltrane was advised of his rights. Gov't Ex. 6a. Mays was advised of his rights in the presence of his attorney in an interview by an FBI agent on January 25, 1972. Both Herrick and Fleming were alive until January, 1974. Stanley did not die until January, 1975, eight months after the indictments were returned
 In addition, there are certain statements contained in the record allegedly made by Herrick which implicate Coltrane in the preparations of the loan documents. See footnote 3, supra. The government also offered some evidence to the effect that, had Herrick lived, he would have been a government witness. See Appellant's brief, p. 54.
 
 
 [18]
 See footnotes 3 and 17, supra
 
 
 [1]
 An important consideration is that the negative power of the Government to withhold prosecution for tactical reasons is perhaps of greater potential harm than the affirmative power to prosecute because, comparatively, it is much less protected against abuse. See United States v. Quinn, 540 F.2d 357, 364 (8 Cir. 1976, Heany, J., dissenting)
 
 
 [2]
 I do not mean to imply that the majority's treatment of the actual prejudice requirement is unprecedented. See, e. g., Judge Henley's dissents in United States v. Lovasco and United States v. Barket, infra ; United States v. Dabney, 393 F.Supp. 529, 536 (E.D.Pa.1975)
 
 
 [3]
 The majority speculates that the loss of witnesses may prejudice the prosecution just as much as it may prejudice the defense because the prosecution bears the burden of proof beyond a reasonable doubt. Supra at 677 n. 12. This conjectural theory has no legal persuasion whatsoever. The fact that the Government, by its own hand, may have suffered actual prejudice does not whitewash the fact that the defense has been similarly harmed
 Indeed, the majority may have misunderstood the constitutional logic of its own test. The Due Process Clause functions to protect the reliability of judicial proceedings wherein "facts" are established. Marion rightly teaches that the Due Process Clause tolerates the erosion of reliability, as caused by pre-accusation delay, if the Government cannot be fairly condemned as precipitating the delay. When, however, the Government must shoulder responsibility, due process at least in my view protects an accused if he can show that the delay has proximately impaired his ability to reconstruct events material to his defense. The fact that the prosecution's ability to reconstruct pertinent events is simultaneously impaired does not mitigate the potential capriciousness of the trial outcome it enhances it. And, I submit, this is especially true when the deceased witnesses were intimately involved in the alleged unlawful activities, unless, for example, the Government can prove, without doubt, that the witnesses would have incriminated the defendants had they been able to testify. E. g., United States v. Bornstein, 447 F.2d 742, 745 (7th Cir. 1971).
 In United States v. Feinberg, 383 F.2d 60, 65 (2d Cir. 1967), the court wrote:
 "Though prejudice is not to be presumed, it may well be that pre-arrest delay may impair the capacity of the accused to prepare his defense, and, if so, such impairment may raise a due process claim under the Fifth Amendment . . .. Such a claim may arise if a key defense witness or valuable evidence is lost . . . , if the defendant is unable credibly to reconstruct the events of the day of the offense . . . , or if the personal recollections of the government or defense witnesses are impaired . . . , because if any of these events occur the reliability of the proceedings for the purpose of determining guilt becomes suspect." (Emphasis supplied; citations omitted.)
 
 
 [4]
 In Lovasco, the prosecution delayed only seventeen months while here the Government tarried four and one-half years. Furthermore, there was not an "absolute certainty" in Lovasco that the accused in fact acquired the guns from the missing potential witness since only the accused testified to that fact; indeed, the Government had theorized that the guns had come from the accused's son, who worked at the post office. 532 F.2d at 61. In the instant case, on the other hand, the special connection that the three missing witnesses, who prepared all of the critical documents, had with the transactions upon which the indictment's dismissed counts were founded was proved beyond any reasonable doubt whatsoever. In terms of length of delay and prejudice convincingly demonstrated, this case, when viewed in toto, greatly overshadows the facts set forth in Lovasco and the due process claim therein vindicated
 
 
 [5]
 I note that Judge Heaney, dissenting in United States v. Quinn, supra argues that federal courts have inherent power divorced from the Due Process Clause to dismiss indictments on grounds of pre-indictment delay. 540 F.2d at 363-64. I share his concern that the hands of our district judges should not be unreasonably tied, particularly in their attempts to deal with inexcusable governmental delay in the pre-arrest phase of criminal proceedings. See K. Davis, Discretionary Justice: A Preliminary Inquiry, 209-14(1969); see generally Note, The Right to a Speedy Trial, 20 Stan.L.Rev. 476, 489 (1968)
 
 
 [6]
 Consequently, the credibility of these witnesses would obviously be vulnerable to severe attack during the course of trial. See United States v. Jones, 173 U.S.App.D.C. 280, 524 F.2d 834, 844 n. 1 (1975)
 
 
 [7]
 The majority attempts to shift some of the blame onto the appellees, who, it is said, had "notice" of the possibility of criminal indictments. Supra at 679 n. 17. I do not subscribe to the "duty to mitigate" implicitly placed upon the defendants here. The defendants had no reason to anticipate the Government's negligence and the attendant proximate risks of prejudice. I know of no rule in a case of this kind calling for the application of some bizarre type of comparative negligence principle. Moreover, whatever "notice" these defendants might have had in 1969-72, they were arguably "lulled to sleep" by the subsequent years in which the Government let the files collect dust due to its lack of interest in the case. Is the majority suggesting that the appellees had either the duty or the power to initiate speedy proceedings before a grand jury and procure indictments against themselves?
 
 
 [8]
 While it is true that there is some evidence that Herrick would have testified as a government witness, the District Court was not impressed, and the majority suggests no reason why it necessarily should have been. It has generally been our rule, at least when judgments of conviction are challenged, that the resolution of questions of credibility is a function of the trial court. Moreover, even if Herrick were going to testify for the Government, in that event the availability of Stanley and especially Fleming would have been all the more vital to the defense. Given the breadth of those of the indictment's dismissed counts, there is little question in my mind that the defendants cannot fairly defend against the charges given the critical participation of the dead and forgetting witnesses in the transactions upon which these counts are forged. Thus, this case does not resemble United States v. Sand, 541 F.2d 1370 (9th Cir. 1976), wherein this Court affirmed, as not clearly erroneous, a specific finding that missing witnesses would not have exculpated the defendant at the expense of self-incrimination
 
 
 [9]
 It is important to emphasize that the district judge, with highly conscientious care, as evidenced by the comprehensive and detailed findings of facts and conclusions of law, scrutinized each of the numerous counts of the indictments in order to determine whether the deceased witnesses had a basis upon which to provide exculpatory information. Only selected counts of the indictments were dismissed. Thus, this case differs materially from those like United States v. McGough, 510 F.2d 598 (5th Cir. 1975), wherein the District Court made no findings of fact and seemingly viewed prejudice as inherent in the delay. See also United States v. Butts, 524 F.2d 975 (5th Cir. 1975)
 
 
 [10]
 I cannot believe that the majority intends to convey a feeling of general hostility in respect to pre -trial dismissals, or motions for such, on grounds of pre-indictment delay. In any event, it seems to me that this type of motion is particularly well-suited for in limine disposition, promoting, as it does, the expeditious and less expensive process of litigation