Jerry Allen ARNOLD,
Petitioner-Appellee,

v.

D. J. McCARTHY, Superintendent,
California Men's Colony,
Respondent-Appellant.

No. 76–1421.

United States Court of Appeals,
Ninth Circuit.

Jan. 13, 1978.

Jack T. Kerry, Deputy Atty. Gen. (argued), Los Angeles, Cal., for respondent-appellant.

James S. Russell (argued), Los Angeles, Cal., for petitioner-appellee.

Before ELY and CARTER, Circuit Judges, and ENRIGHT,* District Judge.

JAMES M. CARTER, Circuit Judge:

This is an appeal by the State of California represented by D. J. McCarthy, Superintendent of the California Men's Colony,

---

* Hon. William B. Enright, United States District Judge, Southern District of California, sitting by designation.

from Jerry Allen Arnold's successful plea in the district court for a Writ of Habeas Corpus. Appellant argues that neither the Due Process Clause generally, nor the speedy trial provisions of the Fifth Amendment were violated by the state's delay in bringing Arnold to trial for robbery and assault. Arnold contends that because of the length of the delay and the fact that before his second trial a critical witness died he was unduly prejudiced, warranting affirmance of the Writ. Additionally, Arnold argues that his right not to be placed more than once in jeopardy for the same offense was violated. We find no constitutional error justifying the grant of the petition for Habeas Corpus and reverse.

## I. FACTS

### A. *The Crime.*

In the evening of January 17, 1968, Arnold was involved in an altercation in a local bar in Santa Barbara. The bartender, Russel Walthers, requested the police to instruct Arnold not to return to the bar again that night. The police complied. At approximately 2:00 a. m. the next morning, as Walthers was closing up the bar, he was brutally assaulted and robbed. Walthers told the police and later testified at trial that Arnold was his assailant. During the robbery Walthers was robbed of his Bulova watch with a flex-band and $155.00 in cash. The officers at the scene found a different watch with a black watchband on the floor in the bar.

Earlier police bookings of Arnold showed that in 1967 he had possessed a watch and watchband similar to that found at the scene of the crime, although evidence also showed that in bookings after the robbery Arnold possessed a Timex watch, not the suspected Bulova.

James Locut, a cousin of Arnold who lives in Oklahoma, saw Arnold at Locut's mother's residence on January 20, 1968, two days after the robbery. He noticed that Arnold's hands were swollen around the fingers. Arnold maintained the bruises and the swelling were the result of a fight he had with a man who owed him money and that he had left town for a few days to let things settle down.

### B. *Procedural History.*

On January 18, 1968, the day of the crime, a complaint was filed against Arnold for robbery and assault with a deadly weapon, in violation of California Penal Code §§ 211 and 245. A warrant for his arrest was issued, but was not served. He was first incarcerated on May 29, 1968, on an unrelated charge of murder. Although he was in state custody pursuant to this murder charge, Arnold was not arrested and arraigned on the robbery-assault charges until January 2, 1969, almost one year after filing of the complaint. On January 28, 1969, he was held to answer on the robbery-assault charges at his preliminary hearing.

Trial on the robbery-assault charges was continued because of the superseding murder trial. In March 1969, Arnold was convicted of the unrelated murder charge and sentenced to life in prison. The robbery-assault case was continued on motion of the prosecution due to the murder conviction. However, Arnold demanded a speedy trial on these charges in April 1969. In July 1969, his trial for robbery-assault was set for October 1969.

On October 29, 1969, trial was held, but resulted in a mistrial due to the failure of the jury to reach a verdict. At this point, on November 4, 1969, the state moved for and received a dismissal of the charges. The state's reasons were (1) that it was satisfied with the fact that Arnold was incarcerated on the murder charge, and (2) that as the case presently stood there was not enough evidence to convict on the robbery-assault charges.

Nevertheless, Arnold had appealed his murder conviction and obtained a retrial. On November 4, 1970, he was retried and acquitted of the murder charge. Immedi-

ately, on November 6, 1970, the state filed a second complaint against Arnold on the prior-dismissed robbery-assault charges. On the same day Arnold filed a motion to dismiss based on speedy trial grounds. Arnold was released on bail on December 1, 1970. On December 21, 1970, he was held to answer at a preliminary hearing at which the victim, Walthers, testified. (This is the third time Walthers had testified. He testified first at Arnold's original preliminary hearing, next at the trial which ended in the hung jury, and finally at the second preliminary hearing.)

The trial was scheduled for February 17, 1971, but on January 18, 1971, the prosecution's major witness, bartender Russel Walthers, died unexpectedly in a fall in a prison cell. Arnold immediately moved in a state court for a Writ of Prohibition to prevent the trial. Trial was continued pending disposition of the motion. *See Arnold v. Superior Court*, 16 Cal.App.3d 984, 94 Cal.Rptr. 589 (1971). Upon denial of the writ on April 22, 1971, Arnold appealed to the California Supreme Court. That court sustained the denial of the writ and retrial was finally held on July 26, 1971. On August 3, 1971, he was found guilty of robbery in the first degree with intent and having in fact inflicted great bodily injury.

Arnold filed successive petitions for Writs of Habeas Corpus in the Superior Court of Sacramento County, the Third Appellate District of the California Court of Appeal, and in the California Supreme Court. Each petition was denied without opinion.

C. *Disposition of Petition for Federal Writ of Habeas Corpus.*

After exhausting his state remedies appellee Arnold sought a Writ of Habeas Corpus in the United States District Court, Central District of California. He argued that he had twice been placed in jeopardy in violation of the Fifth Amendment and that his right to a speedy trial under the Sixth Amendment had been infringed.

The district judge, granting the Writ, ruled:

"[T]he delay between the first and second trials for robbery caused substantial prejudice to the petitioner's right to a fair trial within the meaning of the Due Process Clause of the Fourteenth Amendment. I am not prepared to go so far as to say that the second prosecution was in bad faith, but such a criticism would not be altogether unjustified."

The judge found prejudice because the victim (and major witness) had died before trial, necessitating that his testimony from the first trial be read into the record at the second. Even though the witness was a prosecution witness, the judge held that the jury should have had the opportunity to observe him to make a firsthand determination of his credibility.

## II. ISSUES

A. *Were Arnold's due process or speedy trial rights violated because of the delay in bringing him to trial?*

B. *Did the reprosecution of Arnold after the mistrial and dismissal constitute a violation of his Fifth Amendment right against double jeopardy?*

### III. DISCUSSION

A. *Due Process and Speedy Trial.*

The Constitution provides two separate safeguards against delay in the different stages of the investigation and prosecution of a crime. In the pre-indictment or pre-arrest stage delay is tested by the general proscriptions of due process. Because of statutory safeguards in the form of statutes of limitation, "the Due Process Clause has a limited role to play in protecting against oppressive delay." *United States v. Lovasco*, 431 U.S. 783, 789, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977). Pre-indictment delay is permissible unless it violates "fundamental conceptions of justice which lie at the base of our civil and political institutions," *Rochin v. California*, 342 U.S. 165, 173, 72 S.Ct. 205, 96 L.Ed. 183 (1952). *See also United States v. Lovasco*,

*supra*, 431 U.S. at 790, 97 S.Ct. 2044, 2049. *Ham v. South Carolina*, 409 U.S. 524, 526, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973); *Lisenba v. California*, 314 U.S. 219, 236, 62 S.Ct. 280, 86 L.Ed. 166 (1941); *Hebert v. Louisiana*, 272 U.S. 312, 316 (1926); *Hurtado v. California*, 110 U.S. 516, 535, 4 S.Ct. 111, 28 L.Ed. 232 (1884).

■ But once a person becomes "accused" the more stringent requirements of the Sixth Amendment speedy trial right apply. One becomes "accused" when there is "either a *formal indictment or information* or else the *actual restraints* imposed by *arrest and holding to answer* a criminal charge . . . ." *United States v. Marion*, 404 U.S. 307, 320, 92 S.Ct. 455, 463, 30 L.Ed.2d 468 (1971). (Emphasis added). At this stage, although standards are still imprecise, the courts have been more willing to find delay to be constitutionally impermissible.

This case is complicated because it presents issues of delay encompassing both the pre-arrest and the "accused" stages. After a normal investigation and prosecution of the case to trial, a mistrial and dismissal occurred. Then the process repeated itself, resulting in further investigation and a new trial, this time ending with a guilty verdict. Arnold asks us to lump together the delay incurred by him during his two trials and test the whole period under the stricter speedy trial standards. This we cannot do. The procedural history of this case breaks down into four distinct periods, bringing into play at varying points both the due process and speedy trial provisions of the Constitution. Our review of each period in turn shows that there was no delay or prejudice which justifies granting the Writ of Habeas Corpus.

1. *Period 1: The Initial pre-Arrest Stage (January 18, 1968 to January 2, 1969).*

■ On January 18, 1968, the crime took place and the original complaint against Arnold was filed. However, he was not "accused" in Sixth Amendment terms until about one year later, on January 2, 1969, when he was arrested and arraigned. Even though he was in custody on the unrelated murder offense during much of this time, the period prior to arrest or formal indictment is expressly not protected by the speedy trial provisions. *United States v. Marion, supra* at 321, 92 S.Ct. 455; *United States v. Lovasco, supra*, 431 U.S. at 788, 97 S.Ct. 2044.

■ Under the more lenient due process standard applicable to this period, proof of actual prejudice is necessary before a claim of pre-indictment delay is ripe for adjudication. *United States v. Lovasco, supra*, at 789–790, 97 S.Ct. 2044; *United States v. Mays*, 549 F.2d 670, 675 (9 Cir. 1977). There has been no showing of any actual prejudice to Arnold arising from the one-year delay between the commission of the crime and his first arrest. There is no constitutional harm to Arnold from the original pre-arrest delay.

2. *Period 2: The Stage Between Arrest and the Dismissal (January 3, 1969 to November 4, 1969).*

At this point Arnold was an accused who could (and did) claim a right to a speedy trial under the Sixth Amendment. The Supreme Court in *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1971) defined the nature of the speedy trial test:

"A balancing test necessarily compels courts to approach speedy trial cases on an *ad hoc* basis. We can do little more than identify some of the factors which courts should assess in determining whether a particular defendant has been deprived of his right. Though some might express them in different ways, we identify four such factors: Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." (Footnote omitted).

■ The application of this test produces no error. First, the length of the delay was not so extreme that it requires the implica-

tion of prejudice by itself. Only nine months elapsed between the arrest and the trial. Periods much longer than this have been held permissible. *See United States v. Penland*, 429 F.2d 9 (9 Cir. 1970) ("The mere delay of 17 months between indictment and trial, in the circumstances of this case, does not 'itself demonstrate a violation of the Sixth Amendment's guarantee of a speedy trial.'"); *United States ex rel. Solomon v. Mancusi*, 412 F.2d 88, 90 (2 Cir. 1969), *cert. denied*, 396 U.S. 936, 90 S.Ct. 269, 24 L.Ed.2d 236 (1969) ("dismissal has rarely been granted for a delay of less than several years."). *Compare United States v. Jackson*, 542 F.2d 403 (7 Cir. 1976) ("A certain amount of prejudice must be presumed to flow from the approximately one year delay between arrest and trial."); *United States v. Macino*, 486 F.2d 750 (7 Cir. 1973) (Delay of 28 months in conjunction with shown prejudice held to impair right to speedy trial.); *United States v. Holt*, 145 U.S.App.D.C. 185–86, 448 F.2d 1108–09 (1971), *cert. denied*, 404 U.S. 942, 92 S.Ct. 292, 30 L.Ed.2d 257 (1971) ("The defense claim has prima facie merit if the lapse between arrest and trial is longer than one year."); *United States v. Lustman*, 258 F.2d 475, 478 (2 Cir. 1958), *cert. denied*, 358 U.S. 880, 79 S.Ct. 118, 3 L.Ed.2d 109 (1958) (Delay of four years held to violate right to speedy trial even absent showing of prejudice.).

Furthermore, for the first two months of this period Arnold was engaged in preparing for and defending the unrelated murder trial. A trial on the robbery-assault charges at this time would have been impossible. After the murder conviction he demanded, and within seven months received, a trial on the robbery-assault charges. Without more this is not sufficient to show a speedy trial violation.

3. *Period 3: The Time Between the Dismissal of Charges and Re-Arrest (November 4, 1969 to November 6, 1970).*

■■■ When the mistrial was declared on November, 4, 1969, after the jury failed to reach a verdict in Arnold's first trial for robbery-assault, the prosecution moved to dismiss the charges. The dismissal was granted without prejudice. After the dismissal Arnold was no longer "accused"; he no longer had any right to demand a speedy trial under the Sixth Amendment. Any contention that he was prejudiced by delay between this dismissal and his second trial must be tested under the general requirements of due process.

Arnold remained totally free of the robbery-assault charges for almost exactly one year, until it was learned that he would also be set free on the overturned murder conviction. Then, on November 6, 1970, just two days after he was released from prison, a new complaint was filed on the robbery-assault charges and Arnold was returned to custody.

Arguably, the one-year delay between the dismissal and the renewal of the charges could have resulted in some prejudice due to the death of the victim-witness, Walthers, before the second trial. *See Barker v. Wingo*, 407 U.S. 514, 532, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1971); *Dickey v. Florida*, 398 U.S. 30, 90 S.Ct. 1564, 26 L.Ed.2d 26 (1970); *United States v. Macino*, 486 F.2d 750 (7 Cir. 1973).

■■■ The due process test for impermissible pre-accusation delay requires a delicate balance of the circumstances of each case. *See United States v. Marion, supra*, 404 U.S. at 324–25, 92 S.Ct. 455; *United States v. Lovasco, supra*, 431 U.S. at 796–797, 97 S.Ct. 2044; *United States v. Mays, supra* at 677. Primarily, we must compare the gravity of the actual prejudice shown to the reasons for the delay.[1] *United States v. Lovasco, supra*, at 789–79, 97 S.Ct. 2044.

■■■ On the facts of this case, even assuming that some prejudice was caused to appellee by the failure of Walthers to testify in person at the second trial, the gravity of such prejudice is not serious. Proof of

1. Earlier this year another panel of this circuit implied that the length of the pre-indictment delay by itself was also a factor to weigh in the due process balance. *See United States v.*

actual prejudice due to loss of a witness must be "definite and not speculative," *United States v. Mays, supra* at 677. "The assertion that a missing witness might have been useful does not show the 'actual prejudice' required by *Marion*." *United States v. Mays, supra* at 677, quoting *United States v. Galardi*, 476 F.2d 1072, 1075 (9 Cir. 1973), cert. denied, 414 U.S. 839 and 856, 94 S.Ct. 90, 38 L.Ed.2d 75 (1973).

No evidence was lost because the entire record of the testimony from the first trial was admitted in the subsequent trial. This included extensive cross-examination of Walthers by Arnold's attorney. Furthermore, Arnold had the right to introduce the record from either of the two preliminary hearings at which Walthers also testified. The sole prejudice claimed by appellee is the lost opportunity for the jury to observe the demeanor of the witness. Allegedly the demeanor of the witness was not favorable to the prosecution because in the first trial the jury could not reach a verdict while in the second they could. However, this is speculation in light of the additional evidence adduced at the second trial which was not presented at the first.[2] No specific instances or explanations of why Walthers'

> *Mays, supra* at 678. Although the length of the delay by itself may be relevant to the Sixth Amendment speedy trial right, we do not feel it is of much import under the Due Process Clause. First, it is well recognized that delay *by itself* is only evidence of possible prejudice, not actual prejudice. The due process calculus is not even brought into play until actual prejudice is shown. This is largely because "the law has provided other mechanisms to guard against possible as distinguished from actual prejudice resulting from the passage of time between crime and arrest or charge," *United States v. Marion, supra*, 404 U.S. at 322, 92 S.Ct. at 464. Applicable statutes of limitations are "the primary guarantee against bringing overly stale charges," *United States v. Ewell*, 383 U.S. 116, 122, 86 S.Ct. 773, 777, 15 L.Ed.2d 627 (1966). *See United States v. Lovasco, supra*, 431 U.S. at 789, 97 S.Ct. 2044.
>
> Second, as the panel in *Mays* recognized, the length of the delay must be considered in conjunction with the reasons for it. Courts have traditionally granted the government significant leeway in its decisions about the timing of arrests and indictments. This point is placed in sharp focus by the factual holding of *Marion, supra*. There, a delay of 38 months between the commission of the crime and the indictment had occurred. Finding no due process violation the Court explained:
>
>> "The 38-month delay between the end of the scheme charged in the indictment and the date the defendants were indicted did not extend beyond the period of the applicable statute of limitations here. Appellees have not, of course, been able to claim undue delay pending trial, since the indictment was brought on April 21, 1970, and dismissed on June 8, 1970. Nor have appellees adequately demonstrated that the pre-indictment delay by the Government violated the Due Process Clause. No actual prejudice to the conduct

> of the defense is alleged or proved, and there is no showing that the Government intentionally delayed to gain some tactical advantage over appellees or to harass them. Appellees rely solely on the real possibility of prejudice inherent in any extended delay: that memories will dim, witnesses become inaccessible, and evidence be lost. In light of the applicable statute of limitations, however, these possibilities are not in themselves enough to demonstrate that appellees cannot receive a fair trial and to therefore justify the dismissal of the indictment. Events of the trial may demonstrate actual prejudice, but at the present time appellees' due process claims are speculative and premature."
>
> We could characterize the delay in this case to be either 12 months (the period between the dismissal and the re-arrest) or 34 months (the approximate period between the commission of the crime and the second arrest). However, under either characterization our focus would still be on the nature of the actual prejudice caused by the delay and the legitimacy of the asserted governmental reasons for the delay. Perhaps in an extreme case the length of the delay itself could be serious enough to play a part in the due process formula, but in view of statutes of limitation which operate independently in most cases, that is not likely. The length of the delay is not a critical factor in assessing pre-accusation delay under the Due Process Clause.

2. The record shows that three additional witnesses were produced for the second trial who had not testified originally. Nor was the substance of their testimony placed before the first jury through some other source. The additional evidence adduced at the second trial from these witnesses showed: (1) that the watch found at the scene of the crime might be connected to appellee; (2) that appellee left Santa

demeanor made him unbelievable have been presented. Although some prejudice may be imputed, a more specific showing is necessary before we will find it to be substantial.

Moreover, the prosecution had two good reasons to defer the indictment of Arnold. First, there was no need to waste public time and resources on a trial of a man who was already sentenced to life in prison. Any new sentence would have been cumulative. Second, the prosecution fairly exercised its prosecutorial discretion to delay indictment until sufficient evidence existed to obtain a conviction. In *Lovasco, supra,* 431 U.S. 790–791, 97 S.Ct. at 2049, the Court explained:

> "It requires no extended argument to establish that prosecutors do not deviate from 'fundamental conceptions of justice' when they defer seeking indictments until they have probable cause to believe an accused is guilty; indeed it is unprofessional conduct for a prosecutor to recommend an indictment on less than probable cause. It should be equally obvious that prosecutors are under no duty to file charges as soon as probable cause exists, but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt. To impose such a duty 'would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself,' *United States v. Ewell,* 383 U.S. 116 at 120, 86 S.Ct. 773, 15 L.Ed.2d 627."

The only difference between this case and that in *Lovasco* is that here the prosecution had already brought appellee to trial, resulting in a hung jury. It then realized that its case was too weak to justify continued prosecution. However, if the demands of the proscription against double jeopardy are satisfied (see section III B, *infra*) then the same policies which justify prosecutorial discretion in the first instance justify such discretion in the event that the charges become dismissed without prejudice. The suspect is no longer "accused" and may be relieved of any further burden to defend the charges if sufficient evidence to convict cannot be found. Economical use of crowded judicial time and facilities is facilitated. And the public is protected from having to be satisfied with bringing doubtful prosecutions or no prosecutions at all. *See United States v. Lovasco, supra.* (This opinion by Justice Marshall undertakes a useful review of the justifications for broad prosecutorial discretion regarding the timing of indictments.)

■■■ We hold that the prosecutor has discretion within the bounds of double jeopardy to choose to dismiss improvident charges pending further investigation even if the suspect's defense might be somewhat prejudiced by the delay. *See United States v. Lovasco, supra,* at 795, 97 S.Ct. 2044. In the facts of this case the prejudice shown by Arnold was not so substantial that the second trial violates fundamental conceptions of justice.

4. *Period 4: Between the Second Arrest and the Retrial (November 6, 1970 to July 26, 1971).*

After his arrest on November 6, 1970, Arnold's new trial was scheduled for February 17, 1971. However, due to extended litigation over his motion to dismiss on speedy trial grounds and his petition for a Writ of Prohibition against retrial, the trial could not be held until July 26, 1971.

■■■ Once again he was entitled to his Sixth Amendment right to a speedy trial. However, six of the eight months' delay during this stage of the prosecution was directly caused by his own repeated efforts to forestall or prevent the second trial. The state was making every good faith effort to proceed timely to trial. There was no impermissible delay.

Barbara, California, soon after the crime and arrived in Oklahoma; and (3) that upon arriving in Oklahoma appellee was bruised around the fingers, which he explained by saying he had been in a fight with someone who owed him money.

### 5. Conclusion.

Arnold suffered no constitutionally impermissible prejudice due to delay during the investigation and prosecution of his case. During each of the two periods in which he had a Sixth Amendment right to a speedy trial, the state made every good-faith effort to pursue the charges. During the two periods in which only the less stringent due process standards applied, the state had valid reasons for the delay, which resulted in no substantial prejudice to Arnold.

### B. Double Jeopardy.

The jury at the first trial had deliberated for 12 hours when it returned to the courtroom unable to reach a verdict. At that time the trial court questioned the foreman about the jury deadlock and questioned the jury as a group to determine whether they actually felt there was no reasonable probability of reaching a verdict. Only one juror felt that a verdict could be reached. The court then determined that the reasonable solution would be to declare a mistrial and asked counsel if they agreed. Upon receiving no objection or response from counsel the court declared a mistrial. Then the prosecution moved to dismiss the charges against Arnold for the reasons discussed above. The dismissal was granted.

Arnold contends that his subjection to a second trial violated his Fifth Amendment right not to be placed twice in jeopardy. First, he maintains that the trial court abused its discretion in granting a mistrial for the first trial, thus denying him his right to have his guilt or innocence determined by the original jury he had accepted. Second, he asserts that even if the mistrial was properly ordered the subsequent state-initiated dismissal operates to bar any future trial on the same charges.

### 1. The Declaration of a Mistrial.

Because of the need to accommodate both the interests of the public and the individual, the Supreme Court has fashioned a broad balancing test under which the determination that a mistrial has occurred will not bar a subsequent retrial if, all factors considered, there is either (1) "manifest necessity" for the discharge of the original proceedings, or (2) "the ends of public justice" would otherwise be defeated. *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824); *Illinois v. Somerville*, 410 U.S. 458, 461, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973); *United States v. Jorn*, 400 U.S. 470, 481, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971).

The Supreme Court has explicitly and repeatedly refused to make the standard any more precise. *See, e. g., Illinois v. Somerville, supra*, 410 U.S. at 462, 93 S.Ct. 1066; *United States v. Jorn, supra*, 400 U.S. at 485–86, 91 S.Ct. 547; *Gori v. United States*, 367 U.S. 364, 368, 81 S.Ct. 1523, 6 L.Ed.2d 901 (1960); *Wade v. Hunter*, 336 U.S. 684, 691, 69 S.Ct. 834, 93 L.Ed. 974 (1949).

In spite of the Supreme Court's efforts to eschew any rigid or mechanical rules, it has become well-established law that the paradigm example of "manifest necessity" sufficient to permit a second trial of a defendant in a criminal case occurs when the jury cannot reach a verdict. *Downum v. United States*, 372 U.S. 734, 736, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963); *Keerl v. Montana*, 213 U.S. 135, 29 S.Ct. 469, 53 L.Ed. 734 (1909); *Dreyer v. Illinois*, 187 U.S. 71, 85–86, 23 S.Ct. 28, 47 L.Ed. 79 (1902); *United States v. See*, 505 F.2d 845 (9 Cir. 1974), *cert. denied*, 420 U.S. 992, 95 S.Ct. 1428, 43 L.Ed.2d 673 (1974); *Forsberg v. United States*, 351 F.2d 242 (9 Cir. 1965), *cert. denied*, 383 U.S. 950, 86 S.Ct. 1209, 16 L.Ed.2d 212 (1966). So long as the trial judge has not abused his discretion, a mistrial because of inability to reach a verdict will not bar a second trial.

Courts have isolated a number of significant factors which are useful in determining whether a judge has properly exercised his discretion to declare a deadlocked jury.

These include: (1) a timely objection by defendant, (2) the jury's collective opinion that it cannot agree, (3) the length of the deliberations of the jury, (4) the length of the trial, (5) the complexity of the issues presented to the jury, (6) any proper communications which the judge has had with the jury, and (7) the effects of possible exhaustion and the impact which coercion of further deliberations might have on the verdict. *See, United States v. Gordy,* 526 F.2d 631, 635–36 (5 Cir. 1976); *United States ex rel. Webb v. Court of Common Pleas,* 516 F.2d 1031 (majority and dissenting opinions); *United States v. See, supra* at 851–52; *United States ex rel. Russo v. Superior Court of New Jersey Law Division, Passaic County, et al.,* 438 F.2d 7, 16 (3 Cir. 1973), *cert. denied,* 414 U.S. 1023, 94 S.Ct. 447, 38 L.Ed.2d 315 (1973); *United States v. Goldstein,* 479 F.2d 1061, 1068 (2 Cir. 1973), *cert. denied,* 414 U.S. 873, 94 S.Ct. 151, 38 L.Ed.2d 113 (1973); *United States v. Lansdown,* 460 F.2d 164, 170 (4 Cir. 1972).

■ The application of these factors in the present case shows adequate support for the trial judge's determination that the jury was hopelessly deadlocked. The most critical factor is the jury's own statement that it was unable to reach a verdict. *United States v. See, supra* at 851. Upon receiving a communication from the jury stating that it cannot agree, the trial court must question the jury to determine independently whether further deliberations might overcome the deadlock. *United States v. See, supra* at 851; *United States v. Goldstein, supra* at 1068–69. Merely questioning the jury foreman may not be sufficient, but this circuit has recently held that questioning the foreman individually and the jury either individually or as a group is satisfactory. *United States v. See,* *supra* at 851. At trial below the judge asked the foreman himself and the jury as a group whether they felt there was a reasonable probability of reaching a verdict. Only one juror felt there was.

■ There is no minimum amount of time which a jury must spend in deliberations before a mistrial can be declared. This factor is one which is best left to the determination of the trial judge who was most aware of the circumstances of the trial. *United States v. See, supra* at 852, n. 12; *United States v. Goldstein, supra* at 1069; *United States v. Lansdown, supra* at 169. This was a short trial of ordinary complexity. Twelve hours is not an unreasonably short time for the jury to reach a deadlock.[3]

Also, the judge might have determined that requiring the jury to further deliberate could result in an unfair verdict. Coercion of an already exhausted jury to continue deliberations may induce jurors to accommodate a verdict which they would not otherwise support. *See United States v. See, supra* at 852; *United States ex rel. Russo v. Superior Court of New Jersey Law Division, Passaic County, et al., supra* at 15.

Such compulsion may have resulted in nothing more than needless waste of judicial resources and time if the jury was actually deadlocked. *See United States v. See, supra* at 851; *United States v. Goldstein, supra* at 1068. The record does not tell whether these considerations entered the mind of the trial judge, but their subtle presence in almost every case is additional reason to defer to the district judge's finding.

■ The trial judge did not abuse his discretion to declare a mistrial. The finding that the jury was hopelessly deadlocked

---

**3.** In 1966 studies of jury patterns showed that in trials similar in length to appellee's trial, verdicts were usually reached within 3.7 hours. In cases where no verdict could be reached, 15% resulted in hung juries within four hours. Fifty percent resulted in mistrials by the tenth hour. The average time for a jury to reach a deadlock was 10.8 hours. Kalven & Zeisel, *The American Jury* (1966). *See United States v. See, supra* at 852; *United States ex rel. Webb v. Court of Common Pleas, supra* at 1047 (dissenting opinion).

amounted to "manifest necessity" for purposes of double jeopardy and permits a second trial.

### 2. *Impact of the Dismissal.*

Appellee next urges that the government lost its right to retry him even if the mistrial was properly ordered because of the subsequent state-initiated dismissal. The Supreme court has ruled on an issue very similar to this in *United States v. Sanford,* 429 U.S. 14, 97 S.Ct. 20, 50 L.Ed.2d 17 (1976). In *Sanford* the defendants' first trial resulted in a hung jury and the district court declared a mistrial. Four months later, while the government was preparing for retrial, the defendants sought and received a dismissal of the charges based on a defense of governmental consent to the acts which led to the indictment. The government's appeal of the dismissal was dismissed by this circuit. The government appealed and the Supreme Court remanded for reconsideration. Again the court of appeals ruled that jeopardy had attached and that the dismissal prevented any future trial under the Double Jeopardy Clause of the Fifth Amendment.

In a summary reversal the Supreme Court ruled that the hung jury resulting in the mistrial satisfied the "manifest necessity" requirements of *Perez* independent of the dismissal and permitted a retrial. The Court said:

> "The dismissal in this case, like that in Serfass, was prior to a trial that the Government had a right to prosecute and that the defendant was required to defend. Since in such cases a trial following the Government's successful appeal of a dismissal is not barred by double jeopardy, an appeal from the dismissal is authorized by 18 U.S.C. § 3731." *United States v. Sanford, supra,* 97 S.Ct. at 22.

▮ Here too, because of the hung jury, the state had a right to bring a second trial and appellee Arnold was required to defend. The only difference is that in this case the state was the party which sought the dismissal. However, we have already explained that the prosecutor needs wide latitude in the exercise of his prosecutorial discretion. Once a mistrial had been fairly ordered the situation became analogous to the pretrial period in which the prosecutor has undisputed authority to dismiss charges without fear of being prohibited from reasserting them by the Fifth Amendment. Subsequent to the declaration of a mistrial for reasons which satisfy the "manifest necessity" standards of the Double Jeopardy Clause, the state can dismiss criminal charges without forfeiting the right to retry them.

### III. CONCLUSION

It was error for the district court to grant the Writ of Habeas Corpus. Arnold has shown no violation of his Sixth Amendment right to a speedy trial, his Fourteenth Amendment right to due process, or his Fifth Amendment right not to be twice placed in jeopardy for the same crime. We reverse and remand to the district court with instructions to withdraw the Writ and dismiss Arnold's petition.

ELY, Circuit Judge, Dissenting:

I respectfully dissent. To me, it is inexplicable that my Brothers decide that the delay of more than twelve months between the mistrial and Arnold's rearrest did not result in "actual prejudice." The district judge, in a well-reasoned memorandum of decision, concluded that the delay between trials resulted in "substantial prejudice" to the appellee's due process right to a fair trial. His decision rests solidly upon the record and should require affirmance.

At the outset, however, I express my basic agreement with the majority's formulation of the due process standard governing pre-indictment or pre-arrest delay. *United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), and *United States v. Lovasco,* 431 U.S. 783, 97 S.Ct.

2044, 52 L.Ed.2d 752 (1977), teach that due process bars prosecution because of preindictment delay when the defendant establishes two elements: (1) actual prejudice engendered by the delay; and (2) lack of reasons on the part of the prosecution that justify the delay. The Supreme Court explained in *Lovasco* :

> [P]roof of actual prejudice makes a due process claim concrete and ripe for adjudication . . .. [P]roof of prejudice is generally a necessary but not sufficient element of a due process claim, and . . the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused.

*Id.* at 789, 97 S.Ct. at 2048–49.

Rather, the crux of my protest concerns the application of the due process standard to the present case. First, the majority concludes that any prejudice caused by the unavailability of Walthers, the alleged victim, at the second trial was "not serious" and "speculative." The district judge reached the opposite conclusion, fully articulating the rationale for his conclusion:

> [T]he delay between the first and second trials for robbery caused substantial prejudice to the petitioner's right to a fair trial within the meaning of the Due Process Clause of the Fourteenth Amendment. . . .

Here, the victim-witness, a Mr. Walthers, died before the second trial, and I do not see how it can be denied that this circumstance was prejudicial to the defendant. The petitioner argues, quite simply, that the first trial, at which Mr. Walthers testified, ended in a hung jury with the majority favoring acquittal, whereas the second trial, at which Walthers' prior testimony was read into the record, resulted in a conviction. Walthers' original testimony may well have been flawed by the fact that he was a local drunk, which was brought out at the first trial. He apparently had been jailed for drunk driving

and the defense purported to show that he later had been released on condition that he identify Arnold as his assailant. From this testimony, when combined with the victim's assertedly unattractive appearance, a majority of the first jury may reasonably have chosen to disbelieve Walthers.

The death of the victim-witness in this case deprived the second jury of the opportunity to observe the victim and make firsthand assessment of his credibility. A dry record is a poor substitute for live testimony, and the fact that recorded testimony was available did not negate the prejudice.

The decision of the district judge was neither unique nor unusual. The most common form of prejudice to defendants resulting from delay is the unavailability of key witnesses. *See, e. g., Dickey v. Florida*, 398 U.S. 30, 90 S.Ct. 1564, 26 L.Ed.2d 26 (1970); *United States v. Macino*, 486 F.2d 750 (7th Cir. 1973); *Stuart v. Craven*, 456 F.2d 913, 916 (9th Cir. 1972). My Brothers do not explicitly indicate the standard upon which they base their reversal of the District Court's ruling. The determination that a party has not suffered prejudice constitutes a finding of fact, a finding universally deemed to be reversible only if it can fairly be said that the finding is clearly erroneous. *See United States v. Mays*, 549 F.2d 670, 679–80 (9th Cir. 1977) (district court finding of actual prejudice overturned because "clearly erroneous"). Under that standard the unequivocal factual finding that the delay substantially prejudiced appellee's defense should not be overturned.

The determination of whether pre-accusation delay has violated a defendant's right to due process cannot be made in the abstract. As the Supreme Court has stated, and we have acknowledged, it "will necessarily involve a delicate judgment based on the circumstances of each case." *United States v. Marion*, 404 U.S. 307, 325, 92 S.Ct.

455, 466, 30 L.Ed.2d 468 (1971), *quoted in United States v. Mays*, 549 F.2d 670, 678 (9th Cir. 1977). Even a casual reading of the district judge's carefully written opinion unmistakably reveals that the judge properly engaged in the prescribed balancing process. The judge, who was intimately familiar with the entire case, very carefully weighed the opportunity of the jury to observe Walthers' demeanor as an element possibly essential for a fair trial. In attempting to minimize the prejudice to appellee, my Brothers emphasize the admissibility at the second trial of Walthers' cross-examination at the first trial. As a general proposition and in many cases, the use of prior cross-examination testimony may adequately safeguard the rights of an accused, but, here, we have that exceptional case that entreats a different result. The district judge's reasoning evidences an acute realization of the problem. The judge considered and rejected the prosecutor's argument that the prior cross-examination minimized the potential prejudice to appellee, finding that the prior recorded testimony would not, of itself, enable a jury adequately to make a fair evaluation of credibility. Although the majority rather lamely writes that "[n]o specific instances or explanations of why Walthers' demeanor made him unbelievable have been presented," the district judge specified Walthers' "unattractive appearance" and his previous personal exhibition as a local inebriate.

The principal vice of the approach taken by the majority lies in its imposition of a more stringent standard of review when it is the prosecution, rather than the accused, that appeals. When we review a conviction of an accused, we invariably and properly refuse to re-evaluate the factual determinations made by a jury or a trial judge so long as there is substantial supporting evidence. All the evidence is viewed in the light most favorable to the prosecution. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Kelly*, 527 F.2d 961, 965 (9th Cir. 1976); *Kay v. United States*, 421 F.2d 1007, 1010 (9th Cir.

1970). A corollary postulate is that the credibility of witnesses is not re-examined. *United States v. Ramos*, 558 F.2d 545, 546 (9th Cir. 1977); *United States v. Nelson*, 419 F.2d 1237, 1241 (9th Cir. 1969). It is intolerable that the standard varies when, on the other hand, an accused prevails in the lower court and the prosecution appeals. The reasonable doubt standard and the fundamental conception of fairness and justice crystallized in the due process clause forbid a court of appeals from discriminating against a defendant by giving reduced credence to findings of fact favorable to him.

The majority also states that "the prosecution had two good reasons to defer the indictment of Arnold." I note that *Lovasco* has established that intentional tactical delay by the prosecution is not the only reason for delay that can result in a due process violation. Rather, *Lovasco* directs a sensitive balancing of the governmental interests and the actual prejudice to the defendant.

The first "good reason," according to the majority opinion, is that it would have been foolish to try a person who was already imprisoned for life on an unrelated charge. This excuse, however, clearly is not a valid reason for delay. It was merely a convenient decision to avoid work then thought to be unnecessary. That delay was deliberately and intentionally caused, unlike, for example, the delays often necessitated by crowded dockets and understaffed prosecutor's and public defender's offices. Courts may countenance intentional delay when the prosecution has reason to continue its investigation of the case or for other legitimate reasons pertaining to the merits of the case itself. *See United States v. Lovasco, supra.* Here, on the other hand, the prosecutor's decision to delay was solely for his own convenience. After the prosecutor had tried appellee once *during his incarceration for the unrelated conviction*, he came to the conclusion that, wholly apart from the merits of his case against the appellee, a retrial was not in the public interest. The

correctness of his evaluation is irrelevant. When a prosecutor postpones charges and trial for a lengthy period of time because he perceives no public interest in resolving the case, he should be deemed to have assumed the risk that the delay might substantially prejudice the accused. Or, putting it another way, the accused should not be penalized for such tactical and mistaken inaction for which he was in no way at fault.

Supreme Court precedent lends analogous support to my position. In a case construing the right to a speedy trial, *Dickey v. Florida*, 398 U.S. 30, 90 S.Ct. 1564, 26 L.Ed.2d 26 (1970), the Court ruled that when the State of Florida had delayed prosecution for almost eight years while the accused was in federal custody on ·another charge, "no valid reason for the delay existed; it was exclusively for the convenience of the State. On this record the delay with its consequent prejudice is intolerable as a matter of fact and impermissible as a matter of law." *Id.* at 38, 90 S.Ct. at 1569; *see Taylor v. United States*, 98 U.S.App.D.C. 183, 238 F.2d 259 (1956) (25 months delay between indictment and trial not justified by imprisonment in state institution); *United States v. Reed*, 285 F.Supp. 738 (D.D.C. 1968). While the speedy trial test differs from the due process test for pre-accusation delay, each test requires an inquiry into the reasons for delay. In *Dickey*, as in this case, deaths of potential witnesses prejudiced the accused. In both cases the accused was at all times readily available for trial. In the circumstances here, I find the delay in charging and trying the appellee neither more reasonable nor less prejudicial than in *Dickey*. By reaching this conclusion I do not intend to suggest that a reason that is inadequate to justify the postponement of a speedy trial could never justify the delay of charges or arrest. Such determinations must await the peculiar facts of each case.

The majority advances a second reason for the delay, stating that "the prosecution fairly exercised its prosecutorial discretion to delay indictment until sufficient evidence existed to obtain a conviction." My examination of the record reveals absolutely no support for the implication that the prosecution dismissed the charges for the purpose of conducting further investigations or marshalling new evidence. Even the deputy district attorney who prosecuted the case has not claimed that he conducted investigations between the time of dismissal and the time of renewal of the charges. At the second trial three witnesses who had not testified originally presented new evidence against the appellee, but the record does not indicate when or how the prosecution unearthed these witnesses. It is likely, as the district judge doubtless inferred, that the prosecutor either knew of the witnesses' possible testimony before the first trial and decided not to present it or discovered it in an investigation conducted after the renewal of charges.

Finally, I quote a perceptive, although restrained, remark of the district judge:

> I am not prepared to go so far as to say that the second prosecution was in bad faith, but such a criticism would not be altogether unjustified.

My review of the whole record leads me to believe that bad faith was, in truth, the genesis of the second prosecution, that it would never have occurred had the conviction on the other charge not been reversed, and that, in the light of the entire chain of circumstances, the district judge reached the only conclusion that can mesh with the fair considerations of justice that should always prevail in our Nation.

I would affirm.