**UNITED STATES of America, Plaintiff-Appellant,**

v.

**Joann WALKER, Jeanette Adel Davis, Defendants-Appellees.**

**No. 78–3340.**

United States Court of Appeals, Ninth Circuit.

Aug. 1, 1979.

---

1.

Richard R. Romero, Asst. U. S. Atty. (argued), Los Angeles, Cal., for the U. S.

Stephen J. Hillman (argued), Morton H. Boren (argued), Los Angeles, Cal., for defendants-appellees.

Before SNEED and HUG, Circuit Judges, and ENRIGHT *, District Judge.

HUG, Circuit Judge:

The central issue in this case is whether the 13-month delay between the commission of the offense charged and the return of the indictment constituted a violation of the due process rights of the accused.

On June 8, 1978, the federal grand jury for the Central District of California returned a one-count indictment against appellees Joann Walker and Jeanette Adel Davis. The indictment charged that on May 16, 1977, Walker set fire to the Cedars Dormitory at the Federal Correctional Institution, Terminal Island, and that Davis aided and abetted Walker, all in violation of 18 U.S.C. §§ 2 and 81. Walker and Davis were inmates at the institution at the time of the fire. Appellees filed a motion to dismiss, alleging that their due process rights had been violated by the 13-month pre-indictment delay. The district court granted the motion for dismissal and denied the Government's motion for reconsideration. We hold that the 13-month delay was a justifiable investigative delay and did not substantially prejudice the defendants and we therefore reverse.

## I.

## FACTS

On May 16, 1977, a fire broke out shortly before midnight in the Cedars Dormitory which housed 80 women at the Federal Correction Institute, Terminal Island, California. The FBI concluded its investigation and filed its report with the United States Attorney's Office on July 13, 1977. The investigation included the interview of over 60 inmates and numerous staff personnel. The FBI report revealed strong evidence of arson, but conflicting accounts as to the persons responsible. The black inmates and the white inmates appeared to be at odds and some of each group blamed the fire on members of the other group. Two white inmates, Jane Meisner and Katherine Simpson, stated that shortly before the fire, they saw the defendant Joann Walker, a black inmate, kneeling in front of a storage closet in the dormitory and that there was a glow coming from the closet. They further stated that defendant Jeanette Davis, also a black inmate, was standing next to Walker, acting as lookout. On the other hand, certain of the black inmates (and Diane Youngblood, a white inmate who associated with the black group) accused a group of white inmates, whom they called the

---

* The Honorable William B. Enright, United States District Judge for the Southern District of California, sitting by designation.

"White Nazis", of setting the fire. The FBI report revealed that Youngblood stated in her interviews on May 20 and May 27, 1977 that she saw one of the white inmates, Joan Lopez, just before the fire, walk down the hall with a bottle of paint thinner toward the area where the fire broke out. She said she heard Lopez later, in the company of Meisner and Simpson, make remarks indicating that the blacks would be blamed for the fire.

Youngblood escaped sometime in June of 1977 and was a fugitive until December of 1977. She was interviewed again on December 15, 1977, shortly after her capture. In that interview, she revealed for the first time that the defendant Davis had confided to her that she had acted as Walker's lookout when the fire was set.

On January 6, 1978, the case was assigned to an Assistant United States Attorney. On May 4, 1978, the matter was presented to the grand jury. At that time, after the testimony of eight inmate witnesses before the grand jury, the Assistant United States Attorney decided to seek an indictment against Walker and Davis, but not against Lopez. A second grand jury was scheduled for June 8, 1978, to allow Walker and Davis to testify. Walker declined and Davis did not respond. On June 8, 1978, the grand jury heard the further testimony and then returned an indictment against Walker and Davis. There was a total period of approximately 13 months between the fire and the return of the indictment.

The statute of limitations on this charge of arson is five years, 18 U.S.C. § 3282. The indictment was thus returned well within the statutory limit. The defendants, however, moved to dismiss the indictment on the grounds that the 13-month pre-indictment delay violated the Due Process Clause. The trial court granted the motion, stating that the pre-indictment delay was "unreasonable, unusual and unnecessary". The trial court noted that the FBI investigation was completed in July of 1977 and that the six-month delay in assigning the case to an Assistant United States Attorney in January of 1978, and the subsequent delay in submitting the matter to the grand jury in May of 1978, was "unexcused and unjustified". The trial court rejected a proposed finding that the delay was purposefully intended to secure a tactical advantage for the Government, but found negligence or lack of diligence in failing to proceed as rapidly as the trial court deemed appropriate.

The trial court further found that the defendants had been prejudiced in three ways. First, in October of 1977, most of the percipient witnesses were transferred to other federal institutions; and subsequent to that date, many of them were released from federal custody, which hampered the investigation by the defendants. Secondly, Diane Youngblood, who had previously escaped from federal custody and was a fugitive from June, 1977 to December, 1977, again escaped in June of 1978 and was a fugitive at the time the trial judge entered his order. The judge stated that she could have testified favorably on behalf of the defendants, could have possibly implicated another person as the one responsible for the fire, and could have possibly impeached a Government witness. Thirdly, the trial court cites as prejudicial to the defense the fact that the dormitory structure had been rebuilt without preserving any evidence from the area where the fire supposedly began.

II.

DISCUSSION

A. *Augmentation of Record.*

■ Preliminarily, we dispose of a procedural question. The Government seeks to enlarge the record on appeal, citing Rule 10(e) of Fed.R.App.P. to show that Diane Youngblood has been returned to custody and is now available to the appellees. Rule 10(e) cannot be used to add to or enlarge the record on appeal to include material which was not before the district court. *McKinney v. Boyle,* 404 F.2d 632, 633 (9th Cir. 1968), *cert. denied* 394 U.S. 992, 89 S.Ct. 1481, 22 L.Ed.2d 767 (1969); *Borden, Inc. v. FTC,* 495 F.2d 785, 787–88 (7th Cir. 1974);

*United States ex rel. Mulvaney v. Rush,* 487 F.2d 684, 687 (3d Cir. 1973); 16 Fed.Prac. and Proc. § 3956, p. 387 (1977). Therefore, inasmuch as the affidavits were not part of the evidence presented to the district court, the Government cannot now add these documents to the record on appeal. We are here concerned only with the record before the trial judge when his decision was made.

### B. *Pre-Indictment Delay.*

■ As the Supreme Court has recently noted, the statute of limitations provides the primary guarantee against the bringing of stale charges. However, the statute of limitations does not define the full scope of a defendant's rights to have charges promptly brought. The Due Process Clause has a limited role to play in protecting against oppressive delay. *United States v. Lovasco,* 431 U.S. 783, 789, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977).

In describing the limited role of the Due Process Clause in this area, the Court stated:

> [P]roof of prejudice is generally a necessary but not sufficient element of a due process claim, and . . . the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused.
>
> . . . [T]he Due Process Clause does not permit courts to abort criminal prosecutions simply because they disagree with a prosecutor's judgment as to when to seek an indictment. Judges are not free, in defining "due process," to impose on law enforcement officials our "personal and private notions" of fairness and to "disregard the limits that bind judges in their judicial function." *Rochin v. California,* 342 U.S. 165, 170, [72 S.Ct. 205, 209, 96 L.Ed. 183] (1952). Our task is more circumscribed. We are to determine only whether the action complained of—here, compelling respondent to stand trial after the Government delayed indictment to investigate further—violates those "fundamental conceptions of justice which lie at the base of our civil and political institutions," *Mooney v. Holohan,*

294 U.S. 103, 112, [55 S.Ct. 340, 342, 79 L.Ed. 791] (1935), and which define "the community's sense of fair play and decency," *Rochin v. California, supra,* 342 U.S. at 173, [72 S.Ct. at 210.] . . . .

*Lovasco,* 431 U.S. at 790, 97 S.Ct. at 2049.

The Court in *Lovasco* thoroughly examined the policy for not requiring, as a constitutional mandate, that the prosecutor bring charges as soon as probable cause has been established. The Court further rejected the argument that the Government is constitutionally required to file charges promptly, once it has assembled sufficient evidence to prove guilt beyond a reasonable doubt. *Id.* at 791–792, 97 S.Ct. 2044.

Several reasons were identified by the Court for allowing considerable latitude in the timing of the commencement of prosecution:

> First, compelling a prosecutor to file public charges as soon as the requisite proof has been developed against one participant on one charge would cause numerous problems in those cases in which a criminal transaction involves more than one person or more than one illegal act. In some instances, an immediate arrest or indictment would impair the prosecutor's ability to continue his investigation, thereby preventing society from bringing lawbreakers to justice. In other cases, the prosecutor would be able to obtain additional indictments despite an early prosecution, but the necessary result would be multiple trials involving a single set of facts. Such trials place needless burdens on defendants, law enforcement officials, and courts.
>
> Second, insisting on immediate prosecution once sufficient evidence is developed to obtain a conviction would pressure prosecutors into resolving doubtful cases in favor of early—and possibly unwarranted—prosecutions. The determination of when the evidence available to the prosecution is sufficient to obtain a conviction is seldom clear-cut, and reasonable persons often will reach conflicting conclusions. . . . Even if a prosecutor concluded that the case was weak and

further investigation appropriate, he would have no assurance that a reviewing court would agree. To avoid the risk that a subsequent indictment would be dismissed for preindictment delay, the prosecutor might feel constrained to file premature charges, with all the disadvantages that would entail.

Finally, requiring the Government to make charging decisions immediately upon assembling evidence sufficient to establish guilt would preclude the Government from giving full consideration to the desirability of not prosecuting in particular cases. The decision to file criminal charges, with the awesome consequences it entails, requires consideration of a wide range of factors in addition to the strength of the Government's case, in order to determine whether prosecution would be in the public interest. Prosecutors often need more information than proof of a suspect's guilt, therefore, before deciding whether to seek an indictment. . . . Requiring prosecution once the evidence of guilt is clear, however, could prevent a prosecutor from awaiting the information necessary for such a decision.

*Id.* at 793–795, 97 S.Ct. at 2050–51.

The Court, in a footnote, speaks of an additional problem in closely monitoring the timing of the prosecution of cases:

In addition, if courts were required to decide in every case when the prosecution should have commenced, it would be necessary for them to trace the day-by-day progress of each investigation. Maintaining daily records would impose an administrative burden on prosecutors, and reviewing them would place an even greater burden on the courts.

*Id.* at 793, n. 14, 97 S.Ct. at 2051.

■ Under the *Lovasco* standard, it is not enough to show that the prosecution could have proceeded more rapidly or that there were some months during the period of delay in which no additional investigation was taking place. The prosecution is not expected to account meticulously for each month that is taken in carrying out the appropriate prosecutorial functions. However, the prosecution may not intentionally delay in commencing prosecution for the purpose of obtaining a tactical advantage, to the prejudice of the accused. Also, it may not delay prosecution " 'in reckless disregard of circumstances, known to the prosecution, suggesting that there existed an appreciable risk that delay would impair the ability to mount an effective defense.' " *Lovasco* at 795, n. 17, 97 S.Ct. at 2052.

■ As stated by this circuit in *Arnold v. McCarthy,* 566 F.2d 1377 (9th Cir. 1978), "Pre-indictment delay is permissible unless it violates 'fundamental conceptions of justice which lie at the base of our civil and political institutions'." *Id.* at 1381.[1]

■ We find that the pre-indictment delay in this case did not violate those fundamental conceptions of justice, even though some prejudice to the appellees may have resulted. As the Court stated in *Lovasco,* "to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time". *Lovasco,* 431 U.S. at 796, 97 S.Ct. at 2052.

■ Although the FBI report was completed in July of 1977, there were still conflicting reports as to whether Walker and Davis had been responsible for the fire or whether the "White Nazis" had been responsible. The involvement of Joan Lopez was uncertain. On December 15, 1977, when Diane Youngblood gave the addition-

---

1. The appellees cite this circuit's case of *United States v. Mays,* 549 F.2d 670 (9th Cir. 1977), which predated *Lovasco* by a few months, contending that mere negligence on the part of the Government in delaying the prosecution is a denial of due process if prejudice is shown. However, that case involved a four and one-half year delay, during which time several wit-

nesses had died, and the court was there careful to point out that the determination was a matter of balancing the severity of the prejudice against the reasons for the delay. This type of balancing and the results of that case are consistent with the *Lovasco* test. Even in the *Mays* case, the court did not find a due process violation had occurred.

al information that Jeanette Davis had confided to her that she had acted as Walker's lookout, an important link in the chain of evidence was provided. The case was then assigned to an Assistant United States Attorney who studied the case. He indicated he wanted first to hear the grand jury testimony of the inmates who were key witnesses, in order to assess their credibility and the expected impact of their testimony in a jury trial. It is a proper exercise of the prosecutorial function, as *Lovasco* noted, to allow commencement of prosecution to await an evaluation of the strength of the case.

In viewing the prejudice to the defense of the accused cited by the trial court, we do not find that it is severe. The contention that witnesses are not now available to the defense is not sufficient. There is no showing of what witnesses are unavailable or what their testimony would be. The FBI interviews were made available to the defense and those witnesses deemed important to the defense should be identifiable. There is no showing that witnesses relied upon by the defendants were not able to be located or produced. At most, we have a loss of convenience to the defense in conducting the investigation. These difficulties could be overcome by discovery procedures, subpoenas, requests for production or other pre-trial procedures, short of dismissal of the indictment.

The fact that Diane Youngblood had escaped again and was a fugitive at the time the indictment was dismissed did involve the loss of an important witness. However, it appears from the record that her testimony would probably favor the prosecution more than the defense. She directly implicates Walker and Davis and although she also implicates Joan Lopez in providing the paint thinner, this does not exculpate the defendants. It is, of course, possible that as the trial progressed, her testimony could have been helpful to the defendants.

■ The third area of prejudice cited is that during the period between the fire and the return of the indictment the dormitory was rebuilt, without preserving evidence from the area where the fire is believed to have begun. The destruction of the dormitory created an immediate housing problem for the 80 occupants. The prison authorities determined, as an administrative decision, that the dormitory should be rebuilt as soon as possible, and construction commenced within a few days. There is no way that the indictment could have been brought before the reconstruction began. The unavailability of the building to the defendants, in its damaged condition, had nothing to do with the delay in bringing the indictment. Whether the Government had an obligation to preserve a portion of the building in its burned condition, or to preserve certain evidence from the building pending the criminal trial, is not appropriate for consideration at this time. There is no record of what evidence was preserved, what secondary evidence is available or what prejudice exists to the defendants because of the unavailability of evidence. This issue must await later determination, when appropriately raised. We need only note that the pre-indictment delay had no effect upon the unavailability of such evidence.

Thus, the only showing of prejudice is the inconvenience to the defense in conducting its investigation and the unavailability of Diane Youngblood as a witness. This moderate prejudice to the defendants, when considered with the reasons for delay and the length of the delay, clearly does not amount to a violation of "the fundamental conceptions of justice which lie at the base of our civil and political institutions and which define the community's sense of fair play and decency".

### C. *Specificity and Timeliness of Notice of Appeal.*

■ Two issues are raised concerning the notice of appeal. The first is whether the order appealed from was properly specified in the notice; the second issue is whether the notice of appeal was timely. The trial court entered its order dismissing the indictment on July 31, 1978. The Government then filed a motion for reconsidera-

tion of the order of dismissal on August 18, 1978. On August 25, 1978, the Government filed a notice of appeal of the order dismissing the indictment. The appellees opposed the motion for reconsideration on the grounds that the filing of the notice of appeal divested the district court of jurisdiction to hear the motion for reconsideration. The Government then dismissed the appeal, stating:

Plaintiff filed the Notice of Appeal based on the mistaken belief that such filing was necessary to preserve its right to appeal. Actually, plaintiff's filing of its Motion for Reconsideration—within 30 days of the dismissal of the indictment—tolled the running of the 30-day period during which the Notice of Appeal must be filed. *United States v. Healy,* 376 U.S. 75, 84 S.Ct. 553, 11 L.Ed.2d 527 (1964).

On September 5, 1978, the district court entered its order denying the Government's motion for reconsideration, followed by written findings of fact and conclusions filed on September 27, 1978, discussing the evidence and arguments adduced at both the hearing on the motion to dismiss and the hearing on the motion for reconsideration. The Government filed its notice of appeal on October 2, 1978, stating it was appealing from the order denying the motion for reconsideration.

The appellees argue that the merits of the initial order of dismissal are not before the court because that order was not specified in the notice of appeal, as required by Rule 3(c) of the Federal Rules of Appellate Procedure. The district court's order denying the motion for reconsideration, from which the Government specifically appealed, included the same issues which were presented to the district court and which the court considered when it issued the initial order of dismissal. The court, in its findings of fact and conclusions of law, discussed the orders together. It is apparent the Government intended to appeal both orders; and, since the appellees' brief argues fully the merits of the order of dismissal, appellees have not been preju-

diced or misled by the Government's failure to specifically designate the order which is the subject of the appeal. *Foman v. Davis,* 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).

The second question involved is whether the notice of appeal filed on October 2, 1978 was timely so as to afford an appeal of the July 31, 1978 order. Since the original appeal of that order was dismissed, the notice is timely only if the filing of the motion for reconsideration extends the time for filing the notice of appeal.

Rule 4(b) of the Federal Rules of Appellate Procedure provide that in an appeal taken by the Government, the notice of appeal shall be filed "in the district court within 30 days after the entry of the judgment or order appealed from". Nothing in Rule 4(b) specifically authorizes an extension of time upon the filing of a motion for reconsideration.

The Supreme Court in *United States v. Healy,* 376 U.S. 75, 84 S.Ct. 553, 11 L.Ed.2d 527 (1964), which was relied upon by the Government, holds that in interpreting its own Rule 11(2) concerning appeals from district courts, a petition for rehearing filed within the time fixed for an appeal does terminate the running of the time for appeal and the time begins to run anew from the date of the entry of the order disposing of the motion. We agree with the statement in Moore's Federal Practice:

[T]he central rationale of the holding would appear to make it applicable to appeals from district courts to courts of appeals, as well as to appeals from district courts to the Supreme Court.

7 Moore's Federal Practice, ¶ 204.17. *Accord, United States v. St. Laurent,* 521 F.2d 506 (1st Cir. 1975).

Errors in the trial court may be most speedily corrected by the trial judge. Frequently a trial judge has had to rule on difficult questions under time pressures and without thorough briefing by the parties. A motion for reconsideration may, in some instances, avoid the necessity of an appeal. No purpose is served and procedural complications may in fact arise (as in this case) if

the Government is required to file a notice of appeal on the order while a motion for reconsideration is pending. As pointed out in *United States v. St. Laurent,* 521 F.2d at 512, abuses of this procedure for purposes of delay can be readily controlled by the court. There was no indication of such abuse in this case.

We hold that the appeal was timely and properly filed and reverse the order of dismissal.