UNITED STATES of America,
Plaintiff,

v.

W.R. GRACE, Alan R. Stringer, Henry A. Eschenbach, Jack W. Wolter, William J. McCaig, Robert J. Bettacchi, O. Mario Favorito, Robert C. Walsh, Defendants.

No. CR 05–07–M–DWM.

United States District Court,
D. Montana,
Missoula Division.

June 8, 2006.

Angelo J. Calfo, Harold Malkin, Michelle K. Peterson, Yarmuth Wilsdon Calfo, Seattle, WA, Michael F. Bailey, Bailey & Antenor, William Adam Duerk, Michael J. Milodragovich, Milodragovich Dale Steinbrenner & Binney, Missoula, MT, David S. Krakoff, Gary A. Winters, Mark Holscher, Mayer Brown Rowe Maw LLP, Washington, DC, Ronald F. Waterman, Gough Shanahan Johnson & Waterman, Palmer A. Hoovestal, Hoovestal Law Firm, Helena, MT, Jeremy Maltby, O'Melveny & Myers, Los Angeles, CA, Elizabeth Van Doren Gray, Sowell Gray Stepp & Lafitte, Columbia, SC, William A. Coates, Roe Cassidy Coates & Price, Greenville, SC, for Defendants.

## ORDER

MOLLOY, Chief Judge.

### I. Introduction

Before the Court is a motion by Defendant Eschenbach, filed on behalf of all Defendants, to dismiss Count I of the Indictment in this case due to pre-indictment delay. The Defendants argue that their rights under the Due Process clause of the Fifth Amendment have been violated because the delay in bringing the Indictment has resulted in the loss of witness testimony through death and erosion of memory. The Defendants say the delay is due to the government's negligence and ask that Count I be dismissed, or in the alternative that the Court require the government to file for *in camera* review the record of all instances in which the United States has contemplated criminal prosecution of the Defendants for the crimes charged in the Indictment. The United States opposes the motion. I do not believe the motion is well taken. For the reasons set forth below the motion is denied and Count I will not be dismissed for pre-indictment delay.

### II. Background[1]

Count I of the Indictment charges a conspiracy with two objectives: to violate the Clean Air Act, 42 U.S.C. § 7413(c)(5)(A) and to defraud the United States in violation of 18 U.S.C. § 371. The conspiracy is alleged to have spanned the years from 1976 until 2002. The Defendants argue that the government had the information it needed to file the conspiracy charged in Count I many years before the Indictment was brought in 2005, and that the delay has prejudiced their defense because of the loss of witness testimony. The Defendants rely primarily upon two

---

1. The facts of this case are well known to the Court and the parties and will not be recited here except where necessary.

events listed in the Indictment in the "OVERT ACTS" section. First is Defendant Grace's effort in 1980–81 to dissuade the National Institute for Occupation Safety and Health ("NIOSH") from conducting an epidemiological study of workers at the Libby mine. The other is Grace's allegedly tardy disclosure to the Environmental Protection Agency ("EPA") in 1992 of an animal study on the effects of tremolite (the "Hamster Study"). The government alleges that under the Toxic Substances Control Act ("TSCA") the Hamster Study should have been disclosed to the EPA in response to an earlier EPA request in 1983. The Defendants characterize these allegations as "the cornerstones of the defraud prong of Count I" and argue that the government should have charged the Count I conspiracy soon after learning of the Hamster Study in 1992. Defs' Br. at 3.

### III. Analysis

#### A. Legal standard

The statute of limitations provides the primary protection against prejudice to a criminal defendant due to pre-indictment delay, but it does not fully define a defendant's rights with respect to events occurring prior to indictment. *United States v. Marion*, 404 U.S. 307, 324, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). In *Marion*, the Supreme Court held that the Due Process clause of the Fifth Amendment provides some protection against pre-accusation delay resulting in actual prejudice to a defendant. *Id.* It has been left to lower federal courts to determine the contours of the Fifth Amendment's protection. *See United States v. Lovasco*, 431 U.S. 783, 797, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977) ("We therefore leave to the lower courts, in the first instance, the task of applying the settled principles of due process that we have discussed to the particular circumstances of individual cases.").

■ The Ninth Circuit has adopted a two-part test for determining whether a delay in bringing prosecution violates defendant's right to due process, recently articulated in *United States v. Barken*, 412 F.3d 1131 (9th Cir.2005). "First, a defendant must prove that he suffered actual, non-speculative prejudice from the delay, meaning proof that demonstrates exactly how the loss of evidence or witnesses was prejudicial." *Id.* at 1134 (internal quotations omitted). The actual prejudice requirement imposes a heavy burden that is rarely met. *Id.* Actual prejudice from lost witness testimony cannot be established where the lost testimony would be inadmissible or cumulative of the testimony of an available witness. *See United States v. Ross*, 123 F.3d 1181, 1186 n. 1 (9th Cir. 1997) (inadmissible testimony insufficient); *United States v. Huntley*, 976 F.2d 1287, 1291 (9th Cir.1992) (cumulative testimony insufficient). It is not enough that lost evidence or testimony be of some benefit to an accused; to make the requisite non-speculative demonstration, a defendant must show that the loss "has actually impaired his ability meaningfully to defend himself." *United States v. Pallan*, 571 F.2d 497, 501 (9th Cir.1978).

■ The second prong of the test applies only if the defendant succeeds in demonstrating actual prejudice. *Barken*, 412 F.3d at 1134. "In the second part, the delay is weighed against the reasons for it, and the defendant must show the delay offends those fundamental conceptions of justice which lie at the base of our civil and political institutions." *Id.* (internal quotations omitted). The second prong is a balancing test: "The greater the length of delay and the more substantial the actual prejudice to the defendant becomes, the greater the reasonableness and the necessity for the delay will have to be to balance

out the prejudice." *United States v. Mays*, 549 F.2d 670, 678 (9th Cir.1977).

The Ninth Circuit has repeatedly emphasized that the Due Process clause plays a limited role in this area because the statute of limitations remains the primary protection against prejudicial pre-indictment delay. *United States v. Moran*, 759 F.2d 777, 782 (9th Cir.1985); *Ross*, 123 F.3d at 1185.

## B. Discussion

### 1. Identifying the relevant interval to be considered

 This case requires an initial determination of the appropriate interval to be considered in deciding whether there has been prejudicial pre-indictment delay. Ninth Circuit case law teaches that the clock does not begin to run for purposes of pre-indictment delay until the final criminal act (or final overt act in the case of a conspiracy) is allegedly committed. *See, e.g., Mays*, 549 F.2d at 678 (calculating the delay as "[t]he length of time between the commission of the last overt act alleged in the indictments and the return of the indictment.") (dates in parentheses omitted); *Pallan*, 571 F.2d at 499 (referring to the "delay between the date of the latest criminal act ... and the date of the indictment"). If, as these cases imply, the relevant interval is the time from the date of completion of the last act done in furtherance of the charged conspiracy to the date of the indictment, the delay in this case is much shorter than the Defendants say. The last alleged overt act took place April 10, 2002, and the Indictment is dated February 7, 2005. Given the complexity of the scientific issues involved in this case and the number of witnesses and exhibits, a delay of less than three years between the final overt act and the Indictment is reasonable and does not violate due process.

The Defendants argue that the delay is closer to thirteen years, from the disclosure of the Hamster Study in April of 1992 until the Indictment in February of 2005. This argument relies in large part on the reasoning supporting the Defendants' motion to dismiss Count I as duplicitous, *i.e.*, that Count I charges two conspiracies, one ending in the early nineties and another "cover-up" conspiracy beginning in 1999 and ending in 2002. To that extent the Defendants' argument is foreclosed by the Court's conclusion that Count I can be fairly read to charge only one conspiracy. *See United States v. Grace, et al*, 2006 WL 1211162 (D.Mont.2006). The Defendants' contention that the Count I conspiracy should have been charged in 1992 appears to be little more than an effort to re-argue their duplicity motion.

This raises serious questions about the viability of the Defendants' motion to dismiss due to pre-indictment delay. However, because the Ninth Circuit has not spoken definitively as to the proper method of calculating the relevant interval, I will consider the issue on the merits and analyze the longer delay alleged by the Defendants in accordance with the Ninth Circuit's test.

### 2. Actual prejudice

 The Defendants claim actual prejudice from the loss of the testimony of five witnesses who died between 1992 and 2005, and a sixth who died after the Indictment was filed in 2005. Protection from lost testimony generally may be found only in the statute of limitations. *Moran*, 759 F.2d at 782 (citing *Pallan*, 571 F.2d at 501). The Defendants have cited no Ninth Circuit case in which a due process claim based on lost testimony was upheld, and the Circuit has wondered "whether lost testimony can ever constitute actual prejudice given its generally speculative nature." *Ross*, 123 F.3d at 1185 (citing *Moran*, 759 F.2d at 782). Each claim of lost testimony is discussed in turn below.

### a. Earl Lovick

Earl Lovick was general manager of the Libby Mine from 1968 to 1971 and the manager of administration from 1971 to 1983. Defendants claim Lovick would have testified in accordance with testimony he gave in many civil depositions involving Grace, which would include "exculpatory testimony on improvements to working conditions and worker safety, health warnings, monitoring of employees' health, and Defendants' state of mind regarding the allegations in the Indictment." Defs' Br. at 10–11. The government counters that Lovick's sworn testimony is inculpatory and states that it would likely call Lovick to testify for the prosecution were he alive.

The Defendants have not demonstrated that the loss of Lovick's testimony constitutes actual prejudice. The description of his testimony is speculative and of insufficient detail to allow a determination as to its importance to the defense. *See Mays,* 549 F.2d at 670 ("However, because the record only reveals what the subject matter of the decedent witness' testimony would have been and not its actual content, its potential benefit or detriment to the defendants cannot be accurately evaluated."). The Defendants provide nothing of the content of Lovick's testimony other than to say that it would be exculpatory. Moreover, given the number of people employed at the Libby mine during Lovick's tenure, it is likely that he is not the only person who could testify on the topics of health and safety improvements at the mine, raising the strong possibility that his testimony would be cumulative of that of other defense witnesses. There is also a potential admissibility issue, as it is unlikely Lovick would be allowed to testify as to the Defendants' state of mind.[2]

### b. Dr. William Smith

Dr. Smith conducted the Hamster Study, the central finding of which was that tremolite fibers can cause mesothelioma when injected into hamsters. The Defendants claim that Dr. Smith, were he alive, "could testify about studies he performed in which tremolite injected into hamsters was shown to cause mesothelioma and the general state of scientific knowledge about the relationship of asbestos and cancer in the 1970s and 1980s." Defs. Br. at 11. At oral argument, the Defendants argued that Dr. Smith would also have testified about a paper he presented in the late 1977 reporting findings on the effects of tremolite when injected into hamsters. This evidence would be exculpatory, Defendants argue, because it would show that the Hamster Study's findings allegedly concealed by Grace relating to the harmful effects of tremolite were already in the public domain by the time the draft Hamster Study report was complete in 1978.

There is no actual prejudice from the loss of Dr. Smith's testimony as described by the Defendants. They make no non-speculative showing that Dr. Smith's testimony about his study would be useful to the defense. The fact that Dr. Smith presented a paper in 1977 can be established without his testimony. As for Dr. Smith's expected testimony about the general state of scientific knowledge, it is safe to assume that Dr. Smith is not the only person qualified to testify as to the general scientific understanding regarding asbestos and cancer in the seventies and eighties.

### c. Dr. Harold Borgstedt

According to the Indictment, Dr. Borgstedt was a consultant hired by Grace to revise Dr. Smith's report on the Ham-

---

2. *See, e.g.,* Rule 704(b), Fed.R.Evid. (prohibiting expert witnesses from testifying as to a defendant's mental state where the mental state constitutes an element of the crime charged or a defense thereto).

ster Study. Dr. Borgstedt's revisions allegedly included removal of the study's finding that tumors developed in response to exposure to tremolite fibers were evidence that tremolite fibers in the sizes tested are carcinogenic. Defendants claim Dr. Bogstedt "could testify regarding Defendants' state of mind on the risk to Grace workers and his edits to the Smith draft." Defs' Br. at 11.[3]

Once again the Defendants are speculating. They do not establish the content of the purported testimony or explain how its loss has impaired their ability to defend themselves. The Defendants have not shown actual prejudice from the loss of Dr. Borgstedt's testimony.

### d. Fred Eaton

Fred Eaton was Grace's environmental coordinator and was involved in Grace's testing of its commercial and consumer products to determine whether the normal use and handling of those products caused the release of asbestos. The Defendants say Eaton would have been able to testify "about the high quality of monitoring and sampling equipment at Libby, as well as the training Grace provided in sampling techniques." Defs. Br. at 11. They claim Eaton would also testify about "efforts to make products safer and enhance worker safety." *Id.* The government argues that Eaton's testimony would be inculpatory because the product testing is evidence of the Defendants' knowledge that exposure to their product was unsafe for citizens in non-occupational settings.

Without any more detail, the claim of prejudice from Eaton's lost testimony fails due to its speculative nature and the failure to show how the loss of the testimony causes prejudice. In Eaton's case, it appears likely that at least one other person

would be able to testify from personal knowledge as to each of the topics listed.

### e. Rodney Vining

Rodney Vining was president of Grace's Construction Products Division from 1969 until 1987. Vining gave a deposition in January 2005. Grace claims Vining could have testified "about the topics he addressed in his Government deposition . . . including the high priority Defendants placed on worker safety, exposures at levels below government limits, and improved product safety." Defs' Br. at 11–12.

The Defendants' claim is speculative and there is no indication that Vining was the only person able to testify about the topics of worker safety and product safety at Grace. Moreover, Vining's deposition may be admissible under Rule 804(b)(1), Fed. R.Evid. As a decedent, Vining is unavailable under Rule 804(a)(4). Under Rule 804(b)(1), a decedent's deposition may be admissible if the party against whom the testimony is offered had an opportunity at the deposition to develop the testimony by direct, cross, or re-direct examination. The government no doubt has such an opportunity at its own deposition. No actual prejudice results from the loss of Vining's testimony.

### f. Bill Melcher

Bill Melcher worked for Grace at Libby from 1964 to 1984. He was involved in the construction of the wet mill in the late sixties and served as safety director during his last seven years with the company. The Defendants say he would testify "about efforts to reduce exposures through the wet mill process, efforts to comply with government mandated exposure levels, and education and training of the workers in safe working practices." Defs' Br. at 12.

---

**3.** Dr. Borgstedt's testimony on this subject would likely be inadmissible. *See* Footnote 2 *supra.*

Once again the Defendants' claim is speculative, and there is no indication that Melcher was the only person who knew of Grace's efforts to improve safety and comply with government regulations. The Defendants have not shown that the loss of Melcher's testimony causes actual prejudice.

Where a defendant has failed to establish actual prejudice, the motion to dismiss fails and it is unnecessary to address the second part of the pre-indictment delay test. *United States v. Butz,* 982 F.2d 1378, 1380 (9th Cir.1993). In their Reply Brief the Defendants concede that they have offered only a general description of the testimony of lost witnesses. This is due to their concern that a detailed description of the content of the testimony and an explanation as to how its loss was prejudicial might reveal their trial strategy and defenses. The Defendants are therefore unwilling to offer the detail necessary to meet the first prong of the Ninth Circuit's test unless the Court will allow them to make their showing through an *ex parte* filing for *in camera* review.

There will be no *in camera* review. The government has a right to participate in the argument of this motion. It is the defendant's burden to show actual prejudice. There may in rare cases be good reason to allow a defendant to present the most compelling proof of actual prejudice in the government's absence. This is not such a case because regardless of the con-

tent of the lost witness testimony withheld by the Defendants, the Defendants cannot satisfy the second prong of the pre-indictment delay test as is shown below.

### 3. Length of delay vs. reasons for the delay

■ The Defendants argue that the government is responsible for the delay in prosecution because the facts sufficient to support the charges were known to the government long ago. The Defendants point to Grace's efforts to dissuade NIOSH from studying the health effects of working with Libby vermiculite; Grace's tardy disclosure of the Hamster Study in 1992; and Grace's disclosures to government agencies in the eighties of certain tests and information relating to the toxicity of tremolite.

The Indictment alleges that in response to NIOSH's proposal to conduct an epidemiological study of Libby, Grace executives wrote letters to the agency questioning the need for the study; failed to disclose, for an eight-month period, data that NIOSH requested; and stated to NIOSH that Grace would present its opposition to the study to a higher governmental authority. Indictment ¶¶ 106–109. The Defendants do not mention the allegation in Paragraph 105 of the Indictment that a Grace employee had written a memo to Defendant Favorito, copied to Defendant Wolter, discussing the various options for preventing the NIOSH study from going forward.[4] There is no evi-

---

**4.** The options and recommendations allegedly contained in the memo are as follows:

(a) Obstruct and block, possibly even contesting in the courts. As I understand it, we'd lose and this is not exactly the image we try to project.
(b) Be slow, review things extensively and contribute to delay. This might not be bad policy generally and it is possible that the new Administration's policies will make NIOSH more selective in how scarce staff

resources are allocated after January 20, 1981.
(c) Publish a "preemptive epidemiological study". This could attenuate the resume-enhancement potential for NIOSH study personnel. This could also be a checkpoint for a subsequent NIOSH study when it is released.
(d) Cooperate fully. This agency and its personnel have not always acted with high levels of professionalism on past studies. This option would save NIOSH time and

dence that the government was aware of the existence of the memo prior to the EPA clean-up process beginning in 1999.

The Indictment alleges that the Hamster Study, which was completed in the late seventies, should have been disclosed in 1983 in response to the EPA's request under TSCA § 8(e).[5] Indictment ¶¶ 87, 88, 128–131. The Hamster Study was submitted to the EPA in 1992 under a TSCA Compliance Audit Program ("amnesty program"). Indictment ¶ 132. The amnesty program allowed a reporting party to disclose unreported but potentially reportable information without civil liability, but did not limit criminal liability under TSCA. *See* 56 Fed.Reg. 4128, 4129 (Feb. 1, 1991). Under TSCA, failure to make required disclosures may be a misdemeanor. *See* 15 U.S.C. §§ 2614(3), 2615(b). The Defendants argue that Grace's late disclosure of the Hamster Study "put the government on notice that it might have a basis to prosecute Grace for non-disclosure under TSCA." Defs' Reply Br. at 5.

The Defendants also note several disclosures by Grace to government agencies in the eighties of information which Defendants say informed the government that tremolite was friable and toxic, including:

(1) Grace's disclosure in 1980 to the Consumer Products Safety Commission ("CSPC") of product tests which Defendants say "established the friability of tremolite." Defs' Reply Br. at 6. In the letter accompanying Grace's disclosure of the tests in 1980, the executive vice president of Grace's Construction Products Division stated, "[W]e believe that consumer products sold by Grace do not generate unreasonable risks for users." Gov. Ex. 218 (Letter from E.S. Wood to D. Ray, CSPC, April 1, 1980).

(2) A 1983 TSCA disclosure in which Grace informed the EPA of all known deaths from lung cancer and mesothelioma among workers at the Libby mine. The letter accompanying the disclosure states Grace's belief that "the [mortality] information does not, in our judgment, scientifically demonstrate that our products as currently manufactured and distributed in commerce create a substantial risk." Gov. Ex. 333 (Letter from H. Eschenbach to EPA, March 24, 1983).

(3) Grace's 1986 submission to the EPA of its own epidemiological study (the "McGill Study") and statement that NIOSH's study would be sent separately. The Defendants say the two studies "without question informed the govern-

---

effort, make their study more comprehensive and possibly rule out some inaccuracies. It would not necessarily make NIOSH's conclusions any more responsible. (e) Actively go upstream in NIOSH to personally repeat the same arguments, the first time immediately after receipt of protocol. (f) Actively seek to turn off the sources of the pressure for the study by personally repeating the same arguments. However, the sources may have supplementary reasons not fully shared with NIOSH. (g) Attempt to apply influence via congressmen, senators, lobbyists or others to get it turned off. However, it is not necessarily successful, can backfire, and to be effective must be developed over long periods of time due to the trust required.

There are other options as well. All should be discussed. At this time I tend to favor a phased combination of (b), (c), (e), and (f). Indictment ¶ 105.

5. Section 8(e) of TSCA, 15 U.S.C. § 2607(e), provides:

Any person who manufactures, processes, or distributes in commerce a chemical substance or mixture and who obtains information which reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or the environment shall immediately inform the [EPA] Administrator of such information unless such person has actual knowledge that the Administrator has been adequately informed of such information.

ment of the toxicity of tremolite." Defs' Reply Br. at 6.

Taken together, the Defendants argue, the NIOSH obstruction, the tardy disclosure of the Hamster Study, and the various disclosures made by Grace throughout the eighties put the government on notice of the Count I conspiracy by 1992. The failure to bring charges until 2005 is, according to the Defendants, due to the government's negligence.

There are several problems with the Defendants' argument. They describe the NIOSH exchange as a "central element of the defraud charge of Count I," and similarly characterize the late disclosure of the Hamster Study as a "key element in the defraud charge of Count I." Defs' Br. at 3. But Count I does not contain a defrauding charge. Count I charges a conspiracy with two objects, one of which is to defraud the government. While late disclosure of the Hamster Study made ripe a misdemeanor prosecution under TSCA for failure to disclose, it did not simultaneously inform the government of a conspiracy.

The government did not charge the Defendants under TSCA then, nor has it done so in this case. The NIOSH obstruction efforts also provided the government scant evidence of an agreement to do a criminal act. Trying to convince NIOSH to refrain from doing a study is not illegal, and, whether taken alone or viewed in conjunction with the late release of the Hamster Study more than a decade later, Grace's efforts would not have formed the basis of a good-faith indictment alleging conspiracy. Such a basis did not exist until the EPA's clean-up in Libby, during which millions of pages of internal Grace documents were disclosed to the government for the first time. It was these documents, which detailed the extent of the Defendants' alleged knowledge of the dangers of tremolite and more importantly reflected the Defendants' alleged discussion of ways to conceal the harmful effects of tremolite and avoid liability for the contamination in Libby, that provided the government the evidence it needed to charge the conspiracy alleged in Count I. *See, e.g.,* Indictment ¶¶ 88, 90, 105, 110, 137, and 155.[6]

**6.** Paragraph 88 alleges:

A consultant hired by defendant W.R. GRACE revised Dr. Smith's preliminary draft Final Report [of the Hamster Study] including the removal of the statement that the findings of tumors in response to tremolite asbestos fibers were evidence that tremolite asbestos fibers in the sizes tested were carcinogenic (caused cancer). Defendant W.R. GRACE did not grant Dr. Smith permission to publish the results of the study in scientific literature.

Paragraph 90 alleges:

On or about March 30, 1977, defendant ESCHENBACH responded to the March 29, 1977 memo regarding the proposed epidemiological study, warning that such a study would likely become public knowledge and should not be initiated unless "they [defendant W.R. GRACE] are prepared to deal with that situation."

Paragraph 110 alleges:

On or about July 28, 1982, defendant ESCHENBACH provided copies of the Monson Mortality Study to defendant W.R. GRACE senior management, including defendants FAVORITO, McCAIG, and WOLTER. In his memo, defendant ESCHENBACH stated, "Our major problem is death from respiratory cancer. This is no surprise." The memo further stated, "NIOSH would possibly not pursue the mortality portion of their study if we provided this information to them."

Paragraph 137 alleges:

On or about March 19, 1979, local Libby physician Richard Irons wrote a letter to defendant W.R. GRACE expressing concern about the health of Libby Mine workers and their families and the health effects of take-home dust. In the letter, Dr. Irons proposed conducting a health study. On or about April 10, 1979, defendants W.R. GRACE and ESCHENBACH wrote a memo to Libby management, copied to defendant WOLTER regarding Dr. Irons' proposed study. In the memo, defendant ESCHENBACH stated, "Irons is turning the screw ... We either play the game his way or he

The disclosures made by Grace during the eighties offered little additional indication to the government of the existence of the conspiracy charged in Count I. The fact that the Defendants disclosed some information is not evidence that they were concealing other information, nor is it evidence of an agreement to conceal information.

■ The evidentiary picture as it existed in 1992 might have suggested some wrongdoing on Grace's part, but it was not enough to support the detailed conspiracy charge contained in Count I. It is clear from the face of the Indictment that the facts allegedly underlying the Count I conspiracy were not fully known to the government until after the EPA clean-up began in 1999. Even if the government knew enough to charge lesser crimes in 1992, that does not mean it should have charged the Count I conspiracy then; due process does not require the government to charge a crime before it knows of the facts supporting the charge.

The reason for the "delay" the Defendants complain of is not negligence on the part of the government. The government did not act unreasonably by failing to charge the Count I conspiracy until it had evidence supporting the crime of conspiracy. As the Supreme Court wrote in *Marion*,

> It requires no extended argument to establish that prosecutors do not deviate from "fundamental conceptions of justice" when they defer seeking indictments until they have probable cause to believe an accused is guilty; indeed it is unprofessional conduct for a prosecutor to recommend an indictment on less than probable cause. It should be equally obvious that prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt. To impose such a duty would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself.

431 U.S. at 790–791, 97 S.Ct. 2044 (citation, internal quotation marks omitted).

In weighing the reasons for the delay against the length of the delay, it is impossible to conclude that the delay from 1992 until the filing of the Indictment in 2005 violates "those fundamental conceptions of justice which lie at the base of our civil and political institutions."

The Defendants' motion to dismiss is flawed in several respects. The Defendants view the "delay" as the interval between the last act which Defendants claim should have prompted the government to investigate the situation and the filing of the Indictment, but Ninth Circuit case law teaches that the relevant interval is the time between the last overt act charged in the conspiracy and the filing of the Indict-

is going to blow the whistle." Defendants W.R. GRACE and ESCHENBACH declined Dr. Irons' proposed study.
Paragraph 155 alleges:
On or about July 14, 1993, defendant WOLTER wrote a memo to defendant W.R. GRACE senior management, copied to defendant BETTACCHI, describing defendant W.R. GRACE's assets in Libby. Attached to the memo was a July 6, 1993 memo to defendant WOLTER with an analysis of sales options prepared by defendant STRINGER that stated:

For the same reasons that 3M would not buy the mine, I doubt that any other large corporation will come forward with an offer to buy the entire property. If Grace is going to be able to transfer all of the future responsibilities and liabilities to someone else, they are going to have to be willing to sell to some small organization.
The allegations in Paragraph 105 are set forth in footnote 3 above.

ment. More importantly, the Defendants have failed to make any non-speculative showing of an instance in which lost witnesses testimony has prejudiced their case. Without such a showing they fail to meet the actual prejudice prong of the due process test and their motion may be denied on that basis. But even if the Defendants can make a showing of actual prejudice, their motion fails because the United States had a good reason for failing to bring the action sooner, *i.e.*, it was not aware until after the EPA clean-up in 1999 of the evidence supporting the conspiracy charged in Count I.

### IV. Order

Based on the foregoing, IT IS HEREBY ORDERED that the Defendants' motion to dismiss for pre-indictment delay (Doc. No. 328) is DENIED.